ERVIN KENMORE AND HELENE KENMORE, HUSBAND AND WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 24809.  Promulgated July 21, 1952.

*Eugene O. Cobert, Esq.*, for the petitioners.
*Robert M. Willan, Esq.*, for the respondent.

756

OPINION.

TURNER, *Judge:* The primary contention of the petitioners is that with respect to their residence in Vienna they did not have a war loss under section 127 (a) (2) of the Internal Revenue Code [1] in 1941, or any other year, but in 1945, and without regard to section 127, did have a casualty loss under section 23 (e) (3),[2] when the property was destroyed by fire. Their argument is that they had knowledge that at all times until the fire the residence and furnishings remained intact, that throughout that period they had and retained possession, ownership, and control of the premises and, such being the circumstances, the property was not to be "deemed" to have been lost under section 127 in some year prior to the fire. That the contention made is not sound, we think may now be regarded and accepted as settled law. For income tax purposes, a loss of the property did occur under section 127 in 1941, when war between the United States and Germany was declared, whether the property was or was not physically destroyed. *Ezra Shahmoon,* 15 T. C. 705, affd. 185 F. 2d. 384; and *Abraham Albert Andriesse,* 12 T. C. 907.

In enacting section 127, however, Congress took into account the likelihood that some of the property deemed lost or destroyed, and for which deductions were provided in subsection (a), would not in fact be destroyed but would be recovered, and for that reason, in subsection (c) (1),[3] further provided that "Upon the recovery * * * of property * * * considered under subsection (a) as destroyed or seized in any prior taxable year, the amount of such recovery shall be included in gross income to the extent provided in paragraph (2)."

---

[1] SEC. 127. WAR LOSSES.

(a) CASES IN WHICH LOSS DEEMED SUSTAINED, AND TIME DEEMED SUSTAINED.—For the purposes of this chapter—

* * * * * * *

(2) PROPERTY IN ENEMY COUNTRIES.—Property within any country at war with the United States, or within an area under the control of any such country on the date war with such country was declared by the United States, shall be deemed to have been destroyed or seized on the date war with such country was declared by the United States.

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

* * * * * * *

(e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

* * * * * * *

(3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft. No loss shall be allowed as a deduction under this paragraph if at the time of the filing of the return such loss has been claimed as a deduction for estate tax purposes in the estate tax return.

[3] SEC. 127. WAR LOSSES.

* * * * * * *

(c) RECOVERIES INCLUDED IN GROSS INCOME.—

(1) GENERAL RULE.—Upon the recovery in the taxable year of any money or property in respect of property considered under subsection (a) as destroyed or seized in any prior taxable year, the amount of such recovery shall be included in gross income to the extent provided in paragraph (2).

Under paragraph (2), the amount to be included in gross income was the fair market value of the property "determined as of the date of the recovery," subject to certain adjustments, one such adjustment being dependent upon whether or not the "allowable" deduction under subsection (a) did or did not result in a reduction of any tax. Under subsection (d),[4] property so recovered again acquired a basis for computing gain or loss. Generally, the new basis was to be the fair market value of the property at the date of recovery, subject to adjustments comparable to those prescribed in paragraph (2) of subsection (c) for determining the amount which should be included in gross income by reason of recovery. In the alternative the petitioners claim that there was recovery of the property at Haubenbiglgasse 9 within the meaning of subsection (c) ; that the property was destroyed by fire after such recovery; and that they are still entitled to the deduction claimed.

The difference between the language of subsection (a) of section 127, providing for the loss deduction, and that of subsection (c) providing that upon "recovery * * * of property" the amount of the recovery shall be included in gross income is not, we think, without significance. Under subsection (a) the property is "deemed" to have been destroyed on the date war was declared without regard to whether the property was or was not actually destroyed, whereas in subsection (c) there is no qualification of the word "recovery" where there is to be an inclusion in gross income of the amount of the recovery. In other words, there is no provision to the effect that such property, if in existence, "shall be deemed to have been recovered" upon the happening of some event such as the recapture of the country in which the property was located or the end of hostilities with such country. In such circumstances, we think that Congress meant that, in order for subsection (c) to apply and in order that a taxpayer be required to include the value of the property previously considered as having been lost or destroyed in gross income, there should be the occurrence of some act of repossession, or the obtaining again of

---

[4](d) BASIS OF RECOVERED PROPERTY.—The unadjusted basis of property recovered in respect of property considered destroyed or seized under subsection (a) shall be determined under this subsection. Such basis shall be an amount equal to the fair market value of such property, determined as of the date of the recovery, reduced by an amount equal to the excess of the aggregate of such fair market value and the amounts of previous recoveries of money or property in respect of property considered under subsection (a) as destroyed or seized over the aggregate of the allowable deductions in prior taxable years on account of the destruction or seizure of property described in subsection (a), and increased by that portion of the amount of the recovery which under subsection (c) is treated as a recognized gain from the involuntary conversion of property. Upon application of the taxpayer, the aggregate of the bases (determined under the preceding sentence) of any properties recovered in respect of properties considered under subsection (a) as destroyed or seized may be allocated among the properties so recovered in such manner as the Commissioner may determine under regulations prescribed by him with the approval of the Secretary, and the amounts so allocated to any such property so recovered shall be the unadjusted basis of such property in lieu of the unadjusted basis of such property determined under the preceding sentence.

actual control, before there would be recovery within the meaning of the statute, to the end that the taxpayer would be required to include any amount in respect of such property as income realized in that year, and under subsection (d) the property would again acquire a basis for gain or loss.

In support of their alternative claim, the petitioners argue that they, or their agents, at all times had ownership, possession, and control of the premises, and when Vienna was captured by the Russians from the Germans, on April 13, 1945, there was recovery of the property within the meaning of section 127. Assuming, but not deciding, that the legal theory so advanced is sound, it is our opinion that the factual premise has not been established and the claim must fail. The evidence upon which petitioners must rely to establish their factual premise is, for all practical purposes, limited to the testimony of Oscar Graf, Franz Schiller, and Serafine Michner, and as to Graf, it is sufficient to note that, in so far as it was relevant, his testimony merely was that he visited Helene Kenmore's mother at fairly frequent intervals until she left Vienna for the United States in 1939 and was at the house only a few times after her departure to visit relatives of the mother, and further, that the information, concerning the house, contained in the letters which he wrote to petitioners from Switzerland was such as was given to him by Schiller and Serafine Michner.

If the testimony of Schiller could be taken at face, it would support the claim that he was the petitioners' agent and was in possession or control of the property until it was destroyed by fire. Schiller testified that he inspected the property at least once a week during 1939 to 1945, inclusive, with the exception of the four-and-one-half months in 1939 and 1940 when he was in the German Air Force; that he inspected the property three or four times during April 1945 "to check, as house manager, whether everything was in order and to see whether any damages had occurred through bombing or otherwise"; that he visited the house on the afternoon of April 30, 1945, and found it still in perfect condition, but when he returned in the forenoon of May 1, 1945, it was completely burned down. He also testified that he had a general power of attorney from the petitioners, and was told that he should take care of renting the property according to his own judgment and that the Michner family, who recognized Mrs. Kenmore's ownership of the property, occupied the premises throughout the period 1938 to 1945, until the property was destroyed by fire on the night of April 30–May 1, 1945.

For reasons mentioned hereafter, we are not able to take Schiller's testimony at face and accordingly are unable to conclude that Schiller, or any one acting for petitioners, was in possession or control of the property on April 30, 1945, and for some indefinite time prior thereto.

Whether or not the house was occupied on April 30, 1945, and for some time prior thereto, and, if so, by whom, we do not know. The house was not occupied by the Michners and it seems wholly unlikely that if Schiller had made the inspections and was in possession and control, as claimed by him, he would have known that the Michners were no longer there. The testimony of Serafine Michner was that she lived there up to 1939. She did testify that on April 30 she "saw the house still fully standing and apparently undamaged." She did not testify that she was in the house or that she had any knowledge other than its apparent condition. That she was then and for some time had been living in another district of Vienna is indicated by her testimony that she did not on April 30, 1945, know whether the Germans were still in that part of the city in which petitioners' premises were located, but that in her section of Vienna no Germans were seen after the entry of the Russians on April 9. She "heard" in late afternoon of May 1 that the house had burned down and a few days later went there and found it completely in ruins.

While the petitioners themselves had no direct knowledge of the events that transpired with respect to their property in Vienna, it was the testimony of Ervin Kenmore that they did have correspondence with Schiller and Serafine Michner between May 1945 and March 1946 and with his Vienna banker at some date not shown, and while such correspondence was not offered in evidence, we think it reasonable to assume that Schiller and Serafine Michner did give them an account of what actually did happen to the property. That Schiller did so give his account of the events at some date not too long after the destruction of the property by fire, is indicated by the testimony of petitioners' accountant, to the effect that petitioner Ervin Kenmore told him of receiving "a sentimental letter from the caretaker bemoaning the loss" and that it was "out of this conversation I gathered, or understand that it was the villa that was occupied by the Nazis." In the circumstances, it is not without significance, we think, that the petitioners, after their correspondence with Schiller and Serafine Michner, alleged as facts in their petition, which was filed on September 6, 1949, that after the departure of Helene Kenmore's mother in 1939, other relatives [5] occupied the premises until a date in 1944; that thereafter Schiller, the petitioners' agent, "with power of attorney," occupied the premises and continued to occupy the premises until the Nazis evacuated Vienna, and when in April 1945, the Nazis did evacuate Vienna and the Austrian flag was raised, the premises were still intact and in possession of the petitioners' agent.

If petitioners did have possession and control of the property at and prior to its destruction by fire, it must have been through their

[5] Presumably the Michners.

agent Schiller. It is, of course, apparent from Schiller's own testimony that he was not living on the premises at the time it was destroyed. It is also apparent, we think, that he could not have inspected the premises as thoroughly as he claims and not have known that the Michners no longer lived there. In short, we are unable to conclude that Schiller at the time of destruction of the property by fire, or for any considerable period of time prior thereto, had or exercised possession or control over the property. In such circumstances, there is no established basis of fact for finding and concluding that there was recovery of the property by petitioners prior to its destruction. The claim here is a claim of deduction. It is well settled that deductions are matters of legislative grace and a taxpayer seeking a deduction must establish the facts necessary to show that his claim is within the statute. The petitioners have not made such a showing.

*Decision will be entered under Rule 50.*