OPINION. Harron, Judge: The chief question is whether the petitioner was the owner of property in 1945 for which he now claims a loss deduction of $313,838.87. The loss is claimed under either section 23 (e) (1), or (3), or section 117 (j) of the Code. The applicable provisions of the Code are printed in the margin.[8] The petitioner contends that four classes of property located in Tex-plant in Vienna were taken or lost in 1945, and that he was, in law, the owner of the properties, so that he sustained the losses in question. The four classes of property and the amounts of the alleged losses are as follows: Class o) property Amount of loss (a) PreJ.938 machinery allegedly taken by Russians in May, June, 1945_ $74,344.51 (b) Machinery acquired after 1938 by Bagusat with funds of petitioner allegedly seized by Bagusat taken by Russians May, June, 1945- 52,255.26 (c) Merchandise in Texplant taken by Russians in 1945_ 20,000. 00 (d) Merchandise taken by civilians who looted the plant in 1945_ 167,239.10 $313,838.87 Briefly, the petitioner contends that machinery and merchandise in the above amounts were located in Texplant in the spring of 1945, that they were stolen or confiscated by either the Eussians who occupied Vienna, or by civilians, that he owned the properties, and that he was not compensated by insurance or otherwise. The petitioner lost Tex-plant in 1938 but those who had control of Texplant carried on manufacturing operations and made merchandise. Petitioner contends that the records of Texplant contain information from which he can trace back the facts relating to the acquisition of the machinery in question, and the production of the merchandise in question. Upon alleged facts'to the effect that the machinery and merchandise were part of the whole property referred to herein as Texplant, and that such machinery and equipment were located in Texplant before the alleged seizures and thefts in 1945, the petitioner devotes a major part of his argument to the proposition that he became revested, retroactively, with the title to Texplant, to the realty upon which it is located, to the fixtures and machinery in the plant, and to inventories of goods in the plant so that he was the owner throughout 1945, and, therefore, is entitled to make claim for loss deductions in 1945 for the purpose of his United States income tax liability. The petitioner makes other contentions which will be referred to hereinafter. The broad question whether petitioner owned Texplant and its contents in 1945 depends upon whether under Austrian law a revesting of title to the property in petitioner occurred, and whether under Austrian law the revesting of title was retroactive to some point of time before or during 1945. The petitioner has the burden of proof under all issues presented in this proceeding, including the questions relating to Austrian law. Questions of foreign law are questions of fact to be proved by the taxpayer under such issue as is presented here. See: W. J. Burns, et al., 12 B. T. A. 1209, 1224; Columbian Carbon Co., 25 B. T. A. 456, 465; Morris, “Law and Fact,” 55 Harv. L. Rev. 1308; 9 Wigmore on Evidence (3d ed.) par. 2572. If the petitioner is unable to establish by competent proof that he owned the property in 1945 for which he claims loss deductions in 1945, it is unnecessary for us to consider other questions. Therefore, the first issue to be considered is the issue relating to ownership of properties under Austrian law. The respondent contends under the chief issue that the petitioner, under Austrian law, did not own the property in question in 1945 at the time it was taken. He argues that the petitioner has failed to prove the requisite ownership. He claims that under Austrian law, Bagusat was the owner of Texplant from the time he purchased it in 1942 until he was ordered to restore it to petitioner under the 1949 decrees. Briefly, the respondent’s argument is as follows: That there can be no doubt that in 1938 petitioner lost all his Austrian property, a part of which he now claims he lost in 1945, and that petitioner’s loss of property was effective and complete in the year 1938. The respondent points out that the petitioner himself represented in effect that he had abandoned the property, for, in inventorying all his assets wherever situated on Report Form TFR-300, Series A, filed with the United States Treasury Department on November 24, 1941, the petitioner did not report the property located in Austria. The respondent relies upon the rule that the transaction evidencing a loss is completed when property is seized, regardless of the prospects for a future recovery, citing United States v. S. S. White Dental Manufacturing Company of Pennsylvania, 274 U. S. 398. Respondent points out that after Texplant had been confiscated in 1938, it was sold by the German Reich to Kurt Bagusat for 888,000 Reichsmarks, and he argues that under Austrian law, Bagusat was the owner of the property during 1945. Under this argument, respondent relies upon the testimony of an expert on Austrian law, Dr. Steefel, whom respondent called as a witness in this proceeding. The respondent argues, further, that Bagusat did not lose ownership of the property in question until 1949 pursuant to the restitution decree. The evidence under the ownership issue consists chiefly of English translations of the Third Austrian Restitution Law, of selected excerpts taken from the Austrian Law on Public Administrators, of the Austrian Code of Commerce, of the Austrian Civil Code, of numerous decisions handed down by Austrian administrative agencies which are vested with the function of adjudicating rights and liabilities under the Third Kestitution Law and related statutes, and the testimony of expert witnesses, who gave their opinions on questions of Austrian law and the effect of the decrees under the Restitution Law in the litigation instituted by petitioner in 1947. Petitioner called two expert witnesses and respondent called one expert witness. See Havana Electric Railway, Light & Power Co., 29 B. T. A. 1151. The narrow question to be decided under the ownership issue is whether the several decrees, entered in 1949 by the Austrian Restitution Commission in the proceeding which petitioner instituted in 1947 under the provisions of the Third Restitution Law of February 6, 1947, had the effect, under Austrian law, of rendering the title of Bagusat, or any other person, to Texplant and to the realty, fixtures, machinery, merchandise, and other property comprising Texplant, void ah initio, or merely voidable. After careful consideration of all of the evidence, we are of the opinion that, under Austrian law, the title to Texplant and to the property comprising Texplant which, between August 28, 1938, and September 23, 1949, was held successively by the State of Austria, the German Reich (Reich Finance Department), and Kurt Bagusat, was a voidable title which effectively cut off petitioner’s right of ownership until 1949, when title was restored to petitioner by order in a judicial determination and by the recording of title in petitioner in the record of titles. Texplant was taken away from petitioner pursuant to a confiscatory decree, dated June 13, 1938, which had the full force and effect of an Austrian statute. The divestiture became effective as to both the real and personal property comprising Texplant when an appropriate entry was made in the Grundbuch under date of August 23, 1938. Under this entry, title was recorded in the name of the State of Austria. Upon the occurrence of this event, petitioner’s loss of title to Texplant was complete and effective for income tax purposes. United States v. S. S. White Dental Manufacturing Company of Pennsylvania, supra. Pursuant to subsequent entries in the Grundbuch, title to Texplant was effectively transferred under Austrian law to the German Reich, and to Bagusat. Against this background the effect of the Third Restitution Law and the several decrees, entered pursuant thereto in the proceedings brought by petitioner, upon ownership of Texplant may be better understood. The Third Restitution Law provided that acts of dispossession of property perpetrated in Austria under German occupation are null and void. However, as stated in the decision of the Austrian Supreme Restitution Commission, herein referred to as Rkv 110/50, the nullity of such acts of dispossession is not absolute but relative. We understand this to mean that titles acquired through these acts of dispossession are not void ab initio, as petitioner contends, but are voidable. This is made clear in several ways. First, title remains in the “wrongful dispossessor” or those holding title through him, unless and until an appropriate proceeding is brought by the dispossessed owner before the Restitution Commission. Second, the Restitution Commission is vested with discretion to determine ownership in each case brought before it, and, also, to decide claims for damages, mesne profits, and counterclaims for value added to property. When the Restitution Commission determines the various issues before it, it enters a decree which speaks prospectively and not retroactively. The part and final decisions entered in petitioner’s proceeding are illustrative of this fact. These decrees ordered Bagusat to restore Texplant to petitioner within a given time in the future and made nó mention of any retroactive effect to be given to the decrees. Third, when petitioner sought a declaratory judgment for the purpose of having the title of Bagusat and others holding adversely to petitioner declared void ab initio, this relief was denied. Finally, the Civil Code still being the law of the land, title was not restored to petitioner until an entry accomplishing that purpose was made in the Grundbuch. Our conclusions find support both in the testimony of Dr. Steefel, and in the numerous decisions and other authoritative sources of Austrian law to which we have been referred. Dr. Steefel pointed out in his testimony that nothing in the Third Restitution Law or the part and final decrees speaks of retroactive effect. July 31, 1946, is referred to both in the Law and the part decree as the date as of which the quantum, extent, and condition of the property to be restored shall be determined. Clearly this does not mean that Bagusat shall not be deemed owner of Texplant after July 31, 1946, but rather that he is to restore to petitioner following entry of the part decree the same amount, of property as that which comprised Texplant on July 31, 1946. Equally clear, we think, is the fact that the merchandise and machinery taken from Texplant in 1945, never having been physically restored to Texplant at any time thereafter, cannot be deemed to be included among the property which comprised Texplant as of July 31, 1946. As a corollary, the part decree did not order restoration to petitioner of either the property taken from Texplant in 1945, or its value, the Restitution Commission having expressly denied petitioner’s claim for damages. Petitioner, on brief, seeks to attack the conclusion expressed by Dr. Steefel, that neither the part decision nor the final decision was retroactive in effect, on the ground that Dr. Steefel allegedly conceded on cross-examination that with respect to the 1942 mortgages placed on Texplant by Bagusat, the final decision had retroactive effect to as far back as 1942. We disagree with petitioner’s argument. The sense in which the witness used the word “retroactive” in connection with the ordered cancellation of the 1942 mortgages was not that which petitioner seeks to ascribe to him. Actually, all Dr. Steefel said was that in ordering cancellation of the mortgages, the final decision restored Texplant to petitioner in the same condition, insofar as encumbrances were concerned, as it had been in as of 1938, when the property had been confiscated. The cancellation of the 1942 mortgages was ordered prospectively and not retroactively. The final decision refers to Article 10 (2) of the Third Restitution Law as authority for such cancellation. Article 10 (2), in turn, expressly states such “rights in rem” shall cease to exist. This is far from saying that such rights shall be deemed never to have existed. Other questions raised by petitioner under the ownership issue are as follows: (1) Whether the London Declaration of 1943 had the effect of repealing retroactively to the date of enactment, the respective Nazi and Austrian Statutes pursuant to which petitioner’s property was purportedly confiscated. (2) Whether Ordinance No. 4, promulgated by the Allied Military Government for the Fifth District of Austria on or about April 10, 1945, was effective prospectively or retroactively insofar as it proclaimed certain confiscatory laws to be null and void. (3) Whether certain acts of Benedict and Kadlec, allegedly performed in behalf of petitioner on or about April 10, 1945, and thereafter, were effective to restore ownership to petitioner prior to the occurrence of the alleged losses. With respect to the London Declaration of 1943, respondent’s position, we believe, is well taken. On the record, we have found that the London Declaration was a political declaration of intent on the part of the Allied Powers, including the United States and Russia, which has not been carried out by the Government of Austria. Moreover, we think it clear that Ordinance No. 4 was entirely prospective in effect and in no way nullified transfers of title to Austrian property which were effected pursuant to the Nazi confiscatory laws prior to their abrogation by Ordinance No. 4. If the situation were otherwise it would have been unnecessary for former owners of confiscated property, such as the petitioner, to bring an action under the restitution laws in order to regain title. Property rights are of course generally determined by the law of the place where the property is located. It may therefore be appropriate to observe that in arguing before this Court that the property rights of Bagusat should be disregarded and treated as nonexistent, petitioner is in substance asking us to deny effect to the statutes and decrees of a foreign state relating to matters within the territorial limits of such state. The parties have not argued, on brief, this aspect of the petitioner’s contentions, and we find it unnecessary to consider it at any length in arriving at our decision of the general issue. However, we are aware of the doctrine of noninquiry into the validity of acts and laws of foreign states under which it is doubtful whether we can properly fail to give effect, in deciding the question in this proceeding, to the laws and statutes of Austria relating to rights in property in Austria, such as those under which petitioner was divested of title to his property. See Bernstein v. Van Heyghen Freres Societe Anonyme, 163 F. 2d 246, passim (C. A. 2, 1947), certiorari denied 332 U. S. 772; Oetjen v. Central Leather Co., 246 U. S. 297; Ricaud v. American Metal Co., 246 U. S. 304. But see State of Netherlands v. Federal Reserve Bank of New York, 99 F. Supp. 655 (S. D. N. Y. 1951); 57 Yale L. J. 108; 47 Col. L. Rev. 1061; and 23 N. Y. U. L. Q. Rev. 311. As an alternative argument, petitioner argues that he was in reality the owner of the property in question in 1945 because he had “effective control.” In support of this contention petitioner relies on Rozenfeld v. Commissioner, 181 F. 2d 388. He contends that even though he did not have record title to Texplant in 1945, he “had actual possession and control through his employees, Benedict and Kadlec, at the time of the Russian seizures.” The Rozenfeld case is wholly inapposite. There the taxpayer was seeking as a deduction from gross income the amount of an alleged war loss pursuant to section 127 (a) (2) of the Internal Revenue Code. The Court of Appeals for the Second Circuit, in holding the taxpayer not entitled to the deduction, pointed out that although record title at the critical date was in the taxpayer, he had lost effective control which was a prerequisite to ownership. The situation in this proceeding is reversed. Petitioner not only did not have record title at the critical date, but from March 13, 1938, up to and including the last date of the alleged seizures by the Russians, petitioner had not had any contact or communication whatsoever with either Kadlec or Benedict through whom he claims to have established “effective control” over Texplant. On the facts, petitioner’s contention that he owned the property taken in 1945, under the theory of “effective control” cannot be sustained. Cf. Ervin Kenmore, 18 T. C. 754. The expert witnesses of petitioner disagreed sharply with respondent’s expert witness in his conclusions on the point of the retroactivity of the part decree under the Restitution Law. It is their view that Bagusat’s title was rendered void ab initio. Consideration has been given to all of the evidence. We come to the conclusion that the opinion of respondent’s witness, Dr. Steefel, on the crucial question under the Destitution Law and other Austrian law is well supported by the authorities which he cited. It is held that petitioner did not own machinery and merchandise which was taken from Texplant in 1945 in the alleged value of $313,888.87, and that, consequently, he did not sustain losses under either section 23 (e) or 117 (j) of the Code. It follows that other issues presented need not be decided. Decision will be entered under Rule 50. SEC. 23. deductions PROM GROSS INCOME. In computing net income there shall be allowed as deductions : * * * * * * * (e) Losses bt Individuals. — In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise— (1) if incurred in trade or business; or (3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft. * * * SEC. 117. CAPITAL GAINS AND LOSSES. (j) Gains and Losses Prom Involuntary Conversion and Prom the Sale or Exchange of Certain Property used in the Trade or Business.— (1) Definition of property used in the trade or business. — For the purposes of this subsection, the term, “property used in the trade or business” means property used in the trade or business of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than the 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or * * * (2) General rule. — If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation of the threat or Imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For the purposes of this paragraph: (A) In determining under this paragraph whether gains exceed losses, the gains and losses described therein shall be included only if and to the extent taken into account in computing net income, except that subsections (b) and (d) shall not apply. (B) Losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion.