Dezso and Edith Goldner, Petitioners, $v$. Commissioner of Internal Revenue, Respondent.

Docket No. 44884.   Filed December 7, 1956.

*Milton Pariser, Esq.*, for the petitioners.
*Robert J. Cowan, Esq.*, for the respondent.

458

### OPINION.

MULRONEY, *Judge:* The principal issues are whether the petitioner is entitled to a long-term capital loss deduction of $34,147.60 [1] in 1948 under section 23(g) of the 1939 Internal Revenue Code through the worthlessness of stock owned by him in a corporation located in Budapest, Hungary, and whether he is entitled to a deduction in 1948 under section 23(e) of the 1939 Internal Revenue Code for the loss in that year of certain veneers owned by him in Budapest, Hungary.

As shown in the foregoing Findings of Fact, petitioner and his two brothers established the corporation in 1933 for the purpose of operating a sawmill in Budapest, Hungary, and to import various wood products. When petitioner came to the United States in 1941 his two brothers ran the corporation and in 1948 they had the corporation transfer 3,100,000 square feet of veneers to petitioner in payment of petitioner's 1939 advancement to the corporation of 763,854.32 pengos. The bales of veneers remained in storage in Budapest and petitioner made various efforts to sell them but was unsuccessful and in March 1948 the veneers were "nationalized."

---

[1] It does not appear from the record how the petitioner computes this amount as the basis of the stock. We have found as a fact that the basis of the 1,020 shares of stock held by the petitioner in the Budapest corporation was $22,182.50.

Petitioner argues that the advances of 763,854.32 pengos to the corporation in 1939 were loans which were repaid to him in 1946 by the distribution to him by the corporation of approximately 3,100,000 square feet of veneers. He then contends that the nationalization by the Hungarian Government in 1948 of the corporate assets and of the veneers belonging to him caused the stock owned by him in the corporation to become worthless in that year and also resulted in a loss of the veneers in the amount of $134,009.53.

Petitioner's argument falls at several points. We believe that the advances made by petitioner to his corporation in 1939 were capital contributions, not loans. It is not necessary that capital contributions be in proportion to the stockholdings of the various stockholders. *Harry Sackstein,* 14 T. C. 566; *Cambridge Apartment Building Corporation,* 44 B. T. A. 617. There was no evidence of the alleged loan, such as a note, and there was no provision for the payment of interest or for the repayment of the "loan" on any fixed date. See *Alfred R. Bachrach,* 18 T. C. 479, affirmed per curiam 205 F. 2d 151. The petitioner and his two brothers, who were the only stockholders of the corporation, apparently anticipated that the initial capital of the corporation would prove insufficient and they provided in the agreement establishing the corporation in 1933 that "in case the original capital should not be enough [for the operation of the business] * * * without any special agreement the contracting parties will furnish the required capital." Petitioner's only security for the amounts advanced was the corporation itself. After a consideration of all the facts we conclude that the advances petitioner made to the corporation in 1939 were contributions to capital, which would increase the basis of the stock held by the petitioner in the corporation.

Section 127 (a) (2) and (3) [2] of the 1939 Internal Revenue Code established a conclusive presumption that the petitioner's investment

---

[2] SEC. 127. WAR LOSSES.

(a) CASES IN WHICH LOSS DEEMED SUSTAINED, AND TIME DEEMED SUSTAINED.—For the purposes of this chapter—

\* \* \* \* \* \* \*

(2) PROPERTY IN ENEMY COUNTRIES.—Property within any country at war with the United States, or within an area under the control of any such country on the date war with such country was declared by the United States, shall be deemed to have been destroyed or seized on the date war with such country was declared by the United States.

(3) INVESTMENTS REFERABLE TO DESTROYED OR SEIZED PROPERTY.—Any interest in, or with respect to, property described in paragraph (1) or (2) (including any interest represented by a security as defined in section 23 (g) (3) or section 23 (k) (3)) which becomes worthless shall be considered to have been destroyed or seized (and the loss therefrom shall be considered a loss from the destruction or seizure) on the date chosen by the taxpayer which falls between the dates specified in paragraph (1), or on the date prescribed in paragraph (2), as the case may be, when the last property (described in the applicable paragraph) to which the interest relates would be deemed destroyed or seized under the applicable paragraph. This paragraph shall apply only if the interest would have become worthless if the property had been destroyed. For the purposes of this paragraph, an interest shall be deemed to have become worthless notwithstanding the fact that such interest has a value if such a value is attributable solely to the possibility of recovery of the property, compensation (other than insurance or similar indemnity) on account of its destruction or seizure, or both. Section 23 (g) (2) and (k) (2) shall not apply to any interest which under this paragraph is considered to have been destroyed or seized. * * *

in the Budapest corporation became worthless when the United States declared war on Hungary in 1942. Petitioner did not claim any loss deduction for worthless stock in 1942. *Ervin Kenmore*, 18 T. C. 754, affd. 205 F. 2d 90. Congress contemplated recoveries of property or interest deemed lost in the war and therefore provided in subsection (c) (1) that "Upon the recovery in the taxable year of any money or property in respect of property considered under subsection (a) as destroyed or seized in any prior taxable year, the amount of such recovery shall be included in gross income to the extent provided in paragraph (2)." Paragraph (2) provides that the amount to be included in gross income is the fair market value of the recovered property "determined as of the date of the recovery," with certain adjustments, with one such adjustment turning upon whether or not "the allowable deductions in prior taxable years on account of the destruction or seizure of property described in subsection (a)" resulted in a reduction of the taxpayer's tax for that year. Subsection (d) [3] provides for a new basis for the recovered property. This new basis is the fair market value of the property on the date of recovery, with several adjustments similar to those in subsection (c).

It is evident that the petitioner must first establish some new basis for his stock when he recovered it. We cannot say with any great certainty when this event took place. Presumably, it occurred when the United States entered into an armistice agreement with the provisional national government of Hungary on January 20, 1945. Originally, the corporation had issued temporary receipts to the petitioner in lieu of stock, and these temporary receipts had been left behind in Hungary when the petitioner left that country in 1940. Recovery of property "deemed" lost under section 127 (a) must be proven like any other fact. As we pointed out in *Ervin Kenmore, supra,* "there is no provision to the effect that such property, if in existence, 'shall be deemed to have been recovered' upon the happening of some event such as the recapture of the country in which the property was located or the end of hostilities with such country." Assuming, however, that the petitioner recovered his stock in 1945, when hostilities with Hungary ceased, we have no way of placing a value on such stock so that it may

---

[3] SEC. 127. WAR LOSSES.

(d) BASIS OF RECOVERED PROPERTY.—The unadjusted basis of property recovered in respect of property considered destroyed or seized under subsection (a) shall be determined under this subsection. Such basis shall be an amount equal to the fair market value of such property, determined as of the date of the recovery, reduced by an amount equal to the excess of the aggregate of such fair market value and the amounts of previous recoveries of money or property in respect of property considered under subsection (a) as destroyed or seized over the aggregate of the allowable deductions in prior taxable years on account of the destruction or seizure of property described in subsection (a), and increased by that portion of the amount of the recovery which under subsection (c) is treated as a recognized gain from the involuntary conversion of property. * * *

acquire a new basis. · Charles Goldner, one of the stockholders, testi-fied that the corporation suffered "very heavy losses" during the war. Petitioner testified that all of the corporation's structures were de-stroyed, except for the sawmill, and that other assets of the corpora-tion, except for a concealed quantity of veneers, were "either destroyed or robbed." The sawmill was the only operating asset left to the cor-poration after the war and it was in a damaged condition. It was subsequently put in operating condition and rented to another cor-poration. No attempt is made by the petitioner to establish a fair market value for his stock in 1945, and with the unsatisfactory record before us we are unable even to make an approximation. Moreover, there is no evidence of the exchange rate in 1945 of pengos to dol-lars to arrive at some valuation of the petitioner's stock in that year, even if some evidence were produced by the petitioner of the condition of the corporation at the end of the war.

Even assuming that the petitioner had established a new basis for his recovered stock in 1945 under section 127 (d), another serious difficulty presents itself in petitioner's argument. He argues that the nationalization of the corporation in 1948 was the event marking the worthlessness of his stock. We do not have the decree of nationaliza-tion before us and we cannot determine its effect. All we are told is that a "Commissioner of the Government" appeared and took over the operation of the corporation in 1948. Nothing is said about the stock of the corporation held by the petitioner. In *Erwin de Reitzes-Marienwert*, 21 T. C. 846, where the taxpayer claimed a loss for worth-less stock in a corporation nationalized by the government of Czecho-slovakia, we said:

We think the respondent's determination must be sustained. The property owned by the petitioner was stock in Nitra. So far as we can ascertain from the record this stock as such was never seized or nationalized or confiscated by Czechoslovakia. As we read and interpret the decrees of the Czechoslovakian Government on which the petitioner relies, these decrees nationalized the assets of Nitra and not the stock. Perhaps this had the effect of destroying the value of the corporate assets, but even this is not established by the evidence. The fact remains that the petitioner's stock itself was not seized or confiscated. We are not overlooking the fact that the petitioner's stock was in April of 1946 turned over to representatives of Czechoslovakia "purportedly" pursuant to Czechoslovakian Decree No. 95. Nevertheless, the record before us does not contain this decree, we are unable to determine its effect or purpose, and for all that appears, this transfer was made at the voluntary instruction of the peti-tioner and cannot be considered a seizure or confiscation.

We conclude that the petitioner is not entitled to a loss deduction for worthless stock in 1948 through the naturalization of the corporate assets by the Hungarian Government in that year.

Petitioner also makes the argument that he is entitled to a loss deduction in 1948 under section 23 (e) of the 1939 Internal Revenue Code due to the nationalization by the Hungarian Government of the veneers transferred to him by the corporation in 1946. We are convinced that approximately 3,100,000 square feet of veneers were actually transferred to the petitioner by the corporation in 1946. The evidence as to the fair market value of these veneers in 1946 is very unsatisfactory. We do know that these veneers, stored in basements throughout the war years, were in damaged condition. There is a strong suggestion in the record that the veneers would command different sums in different countries. We also know that the valuation problem is further complicated by currency restrictions imposed by the Hungarian Government in 1946. We do not know the official exchange rate of the pengo in terms of dollars in 1946. If, in spite of these difficulties, we arrive at some valuation of the veneers in 1946, we still must decide whether, in fact, the veneers were actually nationalized by the Hungarian Government in 1948 and, further, if such a nationalization did take place, whether it had the effect of making the veneers worthless to the petitioner in that year. There is sufficient testimony that the veneers were taken over by the Hungarian Government in 1948. The landlord of one of the buildings in which the veneers were stored testified that sometime in 1948 the Hungarian Government began paying rent for the basement in which the veneers were stored. Another witness testified that the government decree, which nationalized the corporation in 1948, nationalized "everything what [sic] is connected with the corporations." Even if we agree that the nationalization of the veneers did take place in 1948, it is difficult, without the decree itself, to determine just what the Hungarian Government did in that year.

We think, after an examination of all the evidence, that the petitioner did suffer a loss under section 23 (e) (2) of the 1939 Internal Revenue Code in connection with the veneers in 1948. It is manifest that the petitioner's efforts to dispose of the veneers constituted a "transaction entered into for profit" within the meaning of that section. In determining the amount of the loss, however, we are confronted with the difficulties outlined in the preceding paragraph. We know the veneers were in a damaged condition when they were distributed to the petitioner in 1946. Currency restrictions were in existence in Hungary in that year. We do not know the official exchange rate of the pengo in terms of dollars in 1946. There is no evidence of the value of comparable veneers in Hungary in 1946. There is evidence that the veneers would command different prices depending upon the country in which they were sold. Using our best judgment with the evidence on hand, we have found that the veneers

distributed to the petitioner in 1946 had a fair market value of $5,000. We also find, and so hold, that the petitioner is entitled to a deduction of $5,000 under section 23 (e) (2) in connection with the nationalization of the veneers by the Hungarian Government in 1948.

Petitioner made a trip to Hungary from the United States in 1948 in an unsuccessful effort to sell the veneers. Respondent agrees that expenses in connection with this trip are deductible by the petitioner under section 23 (a) (2) of the 1939 Internal Revenue Code but disputes the amount claimed by the petitioner. Petitioner claims a deduction of $2,518 for traveling expenses covering a period of 61 days. We have examined the evidence on this point and are convinced that the amount so claimed by the petitioner is deductible in full, and we so hold.

The last issue is whether the petitioner may deduct under section 23 (a) of the 1939 Internal Revenue Code certain amounts paid by him as a transferee of Ruger Associates, Inc., in 1948. Petitioner paid the sum of $3,650 as transferee and he concedes $2,307.97 is properly deductible in 1948 as a long-term capital loss but he maintains the balance, or $1,342.03, is deductible under section 23 (a).

Petitioner was a 50 per cent stockholder in Ruger Associates, Inc., which was liquidated in 1946 and paid to the petitioner a liquidating dividend of $6,554.85. In 1948 a judgment was rendered against the Ruger corporation in favor of a construction company for additional costs incurred in the construction of a building for the Ruger corporation. The Ruger corporation paid the amount of the judgment, $6,752.99, which covered the amount of the judgment as well as legal fees and expert witness fees incidental to the trial. Petitioner's claim that $1,342.03 is deductible under section 23 (a) is based on an argument that this portion of what he paid is attributable to attorneys' fees and expert witnesses' fees paid by the corporation in connection with the trial that resulted in the judgment against the corporation. There is no merit in petitioner's contention. All bills and statements by the attorneys and the witnesses in the litigation were rendered to the Ruger corporation. Petitioner's share of the corporation's liability as transferee was $3,650. These expenses were those of the Ruger corporation, not of the petitioner, and the petitioner is not entitled to deduct any portion of them under section 23 (a). *Jacob M. Kaplan*, 21 T. C. 134; *Hal E. Roach*, 20 B. T. A. 919. The entire amount, $3,650, paid by the petitioner in 1948 as transferee relates back to the liquidating dividend, received by him and reported as a long-term capital gain in 1946, and it can only be treated by him as a long-term capital loss. *Arrowsmith* v. *Commissioner*, 344 U. S. 6.

*Decision will be entered under Rule 50.*