AFIA FINANCE CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 361–62. Filed November 21, 1963.

*Edward G. Hearn*, for the petitioner.
*Robert A. Trevisani*, for the respondent.

258

OPINION

The parties are in agreement that under the provisions of section 127 of the Internal Revenue Code of 1939 the petitioner, in December 1941, sustained a war loss of $240,979.49 on its old bonds of $300,000 face value, which had a tax basis to petitioner of $240,979.49, that the loss was deductible in 1941, and that the petitioner has never taken a loss deduction with respect to the old bonds.

The petitioner takes the position that on January 11, 1954, the date the Securities and Exchange Commission removed its restrictions on the handling of transactions in German bonds by securities exchanges and security dealers in the United States, it experienced a

war loss recovery on the bonds and realized a long-term capital gain thereon of $16,000 which was taxable in 1954. The respondent, relying on *George C. Dix,* 34 T.C. 837 (1960), disagrees with the position of the petitioner that January 11, 1954, was the date of petitioner's recovery of its loss within the meaning of section 127. He contends that the record is devoid of facts indicating the recovery date and the amount of the recovery and that therefore any question raised by petitioner with respect to the recognition of gain on the recovery is moot.

The *Dix* case involved the taxable year 1954 and the issue presented was, in essence, when the taxpayer "recovered" within the meaning of section 127 certain old German bonds, some of which were of the same issue as the old bonds of the petitioner involved herein. There the taxpayer, on December 11, 1941, was the owner of and had in his physical possession the bonds there in controversy and continued in physical possession thereof until on December 1, 1953, when he delivered them to a securities company for transmittal to J. P. Morgan & Co. for validation, the latter company being the agent appointed by Germany for validation of the old bonds. Shortly thereafter the securities company delivered the bonds to J. P. Morgan & Co. The bonds were validated on May 6, 1954, and on May 19, 1954, were returned with validation certificates attached to the securities company which, in turn, returned them to the taxpayer on May 21, 1954. On June 24, 1954, the taxpayer presented the old validated bonds to J. P. Morgan & Co. for exchange into new bonds of the Federal Republic of Germany. In a determination of the petitioner's income tax liability the respondent determined that the taxpayer received a short-term capital gain when, in June 1954, he exchanged his old bonds for new bonds of the Federal Republic of Germany. The taxpayer took the position that the "recovery" of his old bonds within the meaning of section 127 occurred in 1953 at the latest. The respondent contended that the "recovery" occurred on January 11, 1954, the date on which the Securities and Exchange Commission removed its restrictions on transactions in German bonds. In holding for the taxpayer it was said:

On the narrow issue actually before us, we think petitioner must prevail. Recovery is not defined or clarified in the statute as the original loss was. We called attention to this distinction in *Ervin Kenmore,* 18 T.C. 754, 758 [affd. 205 F.2d 90 (C.A. 2, 1953)], for example, where we went on to say:

In such circumstances, we think that Congress meant that, in order for subsection (c) to apply and in order that a taxpayer be required to include the value of the property previously considered as having been lost or destroyed in gross income, there should be the occurrence of some act of repossession, or the obtaining again of actual control, before there would be recovery within the meaning of the statute * * *

Respondent's counsel made it clear at the time this case was presented that the issue here was to be treated as purely one of fact. But under the present circumstances, we shall not, as in *Ervin Kenmore, supra*, be able to isolate the determinative fact by resort to an "act of repossession" or the reacquisition of "actual control." It was not the loss of possession or control that caused the destruction here, but rather the presumed repudiation and unwillingness to pay on the part of the debtor. The bonds, if not the debt they represented, belonged to petitioner and were physically in his possession all the time. What was required to reconstitute the property in this case was a restoration of status to the debt. Just as its validity was lost for practical purposes because it became uncollectible when war was declared, see *Bella Feinstein*, 24 T.C. 656; *Ervin Kenmore, supra*, so we think the recovery arose when the validity of the debt was restored by the acknowledgment by the debtor and the establishment of machinery for recognition of that acknowledgment and for the resumption of payments.

We need not say which of the long series of steps leading to this ultimate accomplishment might be thought of as decisive—the German declaration, negotiation of the agreement, passage of the German enabling legislation, ratification by the United States, the President's proclamation,[1] or even the date when validation commenced. At least by the time petitioner's bonds were submitted for validation early in December 1953, with the assurance that they would be accepted[2] and returned, we think all the necessary steps to the "recovery" had been taken, and that accordingly the holding period was in excess of 6 months. [Footnotes omitted.]

The parties have presented the instant case on the basis that the old bonds involved herein were the same bonds represented by the specific certificate numbers involved in the proceeding in the District Court, Frankfurt/Main, First Chamber for Securities Settlements, wherein that court entered its order dated December 23, 1957, and which order became final on or about April 10, 1958. The parties having so presented the case we will consider it accordingly.

In view of what was said in the *Dix* case and of the holding therein, we think it is apparent that the mere fact that the Securities and Exchange Commission removed its restrictions on the handling of transactions in German bonds on January 11, 1954, is not conclusive of the date or time of recovery by petitioner of its old bonds here in issue but that the date or time of recovery is a question of fact to be determined on the basis of the record relating to the time when "all necessary steps to the 'recovery' had been taken." The record herein does not show that prior to or on January 11, 1954, the petitioner had taken any steps directed toward the recovery of its bonds. It is true that the record shows that on February 28, 1955, the German court entered an order containing a declaratory decree favorable to the rights of the petitioner. However, the record does not show when the steps forming the basis of that decree were taken. Furthermore the decree was invalid and was expressly so declared by the court in its order dated December 23, 1957. The application for the issuance and validation of substitute instruments or bonds for the petitioner's lost

bonds and which formed the basis of the proceeding in which the German court's order of December 23, 1957, was entered was received at the "examining administration" on December 28, 1955. A lost instrument indemnity bond required in support of the application was executed on April 30, 1956, but the date on which it was filed is not shown by the record. However, in view of the court's order dated December 23, 1957, we think it fairly may be concluded that such bond was filed at least by that date. Although in its order of December 23, 1957, the court recognized as valid the substitute instruments or bonds issued for the petitioner's old bonds, the court made consent of the Federal Insurance Supervisory Office a prerequisite to petitioner's disposal of the substitute bonds. Since there is no showing nor any contention made that on and prior to December 11, 1941, the petitioner did not have the full and untrammeled right to make disposition of its old bonds at any time it might desire, and since there is no showing that any steps were taken in 1957 to obtain the requisite consent to a disposal of such bonds, it is our opinion that at the end of 1957 all the necessary steps to "recovery" had not been taken. Furthermore, the court's order of validation of the old bonds did not become final until on or about April 10, 1958. Since it is stipulated that on May 13, 1958, the petitioner's agent in the application for the validation of the petitioner's old bonds informed petitioner that such agent had received the new bonds from the German Federal Debt Administration, we can only conclude that the steps taken to obtain the requisite consent of the Federal Insurance Supervisory Office to a disposal of the substitute bonds were taken either on or about May 13, 1958, or a prior date in that year. In view of the foregoing we are of the opinion that it was only in 1958 that all the necessary steps to the "recovery" of petitioner's old bonds had been taken. Accordingly we hold that "recovery" by petitioner as to its old bonds occurred either on or about May 13, 1958, or on a prior date in that year and not on January 11, 1954, as the petitioner contends. Since "recovery" occurred in 1958, the petitioner realized no gain thereon in 1954.

The next issue for determination is whether the transaction in which the petitioner in 1958 transferred its old bonds resulted in a realized and recognizable long-term capital gain to it in that year. Upon transferring in 1958 to the Federal Republic of Germany its old bonds of a face value of $300,000, the petitioner, pursuant to the London Agreement and Annex I thereto, received therefor new bonds of a total face value of $300,000, due October 15, 1969, and bearing interest at the rate of 5½ percent per annum, with the first interest payment thereon due on April 15, 1953. For interest due on April 15, 1942, through October 15, 1944, on the old bonds the petitioner received $45,000 face value of funding issue bonds bearing interest at the rate of 3 percent

per annum and due October 15, 1972, with the first interest payment thereon due on April 15, 1953. For interest due on the old bonds on April 15, 1945, through their maturity date, October 15, 1949, the petitioner received Talon A and for interest on the old bonds from their maturity date to October 15, 1952, the petitioner received Talon B. Since Talons A and B have not been determined to have a market value, their taxable character is not in issue here and they will not be referred to further.

As we understand the position of petitioner, it takes the position that the effective date of the transfer of its old bonds was May 22, 1958. However, we are unable to determine from the record just what date in 1958 the transfer occurred. The petitioner takes the further position that the following items and amounts constituted capital gains:

Accrued interest on the $300,000 face value of new bonds from October 15, 1952, to April 15, 1958, $90,750 and accrued interest on the same bonds from April 15, 1958, to May 22, 1958, $1,650.

The $45,000 face value of funding issue bonds $35,662.50 (the stipulated fair market value of these bonds on May 22, 1958, is $39,150).

Accrued interest on the $45,000 face value of funding issue bonds from October 15, 1952, to April 15, 1958, $7,425 and accrued interest on the same bonds from April 15, 1958, to May 22, 1958, $135.

Since the London Agreement and Annex I thereto are here involved, pertinent portions thereof will be considered. Recitals contained in the first part of the London Agreement show (1) that the parties thereto desired by the agreement to remove obstacles to normal economic relations between the Federal Republic of Germany and other countries and thereby to make a contribution to the development of a prosperous community of nations, (2) that the Federal Republic of Germany desired to put an end to the situation wherein for a period of about 20 years, by reason of the existence of a state of war and otherwise, payments on German external debts had not, in general, conformed to the contractual terms thereof, and (3) that by the agreement the parties thereto sought, among other matters, to provide a satisfactory and equitable single overall plan of settlement of German external debts taking into account the relative position of the various creditor interests, the nature of the various categories of claims, and the general situation of the Federal Republic of Germany.[1]

The London Agreement contained the following respecting creditors, offer of settlement, settlement, and acceptance by creditors of offer of settlement:

[4] 4 U.S.T. 446, 447 (1953).

ARTICLE 8

Definitions

For the purposes of the present Agreement * * * unless the context requires otherwise—

(a) "creditor" means a person, other than the Government of the Federal Republic of Germany, to whom a debt is owing;

*    *    *    *    *    *    *

(g) "offer of settlement," as used in relation to a bonded debt, means an offer by the debtor of terms of payment and other conditions which have been established for such debt in accordance with the present Agreement and the Annexes thereto, by negotiation between the debtor and the appropriate creditors' representative, by final judgment or order of a court or final decision of an arbitral body;

*    *    *    *    *    *    *

(k) "settled," in relation to a debt, means that terms of payment and other conditions have been established for such debt in accordance with the provisions of the present Agreement and the Annexes thereto, by agreement between the creditor and debtor, or, in proceedings between the creditor and debtor, by final judgment or order of a court or by final decision of an arbitral body;

(l) "settlement," in relation to a debt, means the establishment of terms of payment and other conditions in accordance with paragraph (k).

ARTICLE 15

Acceptance by Creditors

(1) Only such creditors shall be entitled to benefit under any provision of the present Agreement and the Annexes thereto, including payment thereunder, as, in the case of bonded debts for which an offer of settlement is the appropriate procedure, accept the offer * * *

(2)—(a) In the case of bonded debts for which an offer of settlement is the appropriate procedure, the acceptance of the offer of settlement, within the meaning of paragraph (1) of this Article, shall be effected by submitting the old bonds or coupons—

(i) for exchange, if new bonds or coupons are issued, or

(ii) for enfacement, if the settlement terms are to be enfaced on the old bonds or coupons.

[4 U.S.T. 447, 448, 453 (1953).]

Annex I to the London Agreement contained the following:

Agreed Recommendations for the Settlement of Reich debts and debts of other public authorities.

### A—Debts of the Reich

The Government of the Federal Republic of Germany (hereafter referred to as the Federal Government) will undertake to offer to the Bondholders *to pay* and *transfer* the following amounts:—

1. The 7 per cent. External (Dawes) Loan 1924

(a) As on the first coupon date following 31st March, 1953, *interest* at 5½ percent. per annum on the American Issue * * *

(b) As on the first coupon date following 31st March, 1958, a sinking fund of 3 per cent. per annum on the American Issue * * * shall be added to the above interest payments and constitute with them a cumulative annuity.

(c) The maturity date shall be extended to the year 1969.

(d) Arrears of *interest* outstanding shall be recalculated at 5 per cent. simple interest, and in respect of the resulting total the Federal Government will issue 20-year Bonds carrying 3 per cent. per annum interest and after 5 years 2 per cent. sinking fund. On Bonds for so much as represents arrears due to 31st December, 1944, payment will be made as from 15th April, 1953: Bonds for the balance will not be issued until the unification of Germany when payment on these Bonds will begin.

(e) In all respects other than those indicated above, the terms of the original Loan contracts shall be maintained.

(f) All expenses incidental to carrying out the above modifications of the original contracts shall be borne by the Government of the Federal Republic. [Emphasis added.]

\*       \*       \*       \*       \*       \*       \*

*C.—General Provisions*

8. Procedure for carrying out these proposals

(a) The terms of the proposals may be enfaced on existing bonds or new bonds issued in exchange for existing bonds, and new bonds or fractional scrip issued for arrears of interest, depending upon the convenience and custom prevailing in the several markets in which the bonds were originally issued. Such enfaced bonds or new bonds will conform to prevailing market practice. * * *

Validation

(f) The Federal Government undertakes to do all in its power in order to establish, on the basis of the German Validation Law passed by its Parliament and about to be enacted, an appropriate procedure for the validation of German foreign currency bonds, which procedure shall be effective in the several creditor countries as soon as possible but not later than on 1st February, 1953.

Payment on bonds or coupons which require validation under the German validation procedure shall not be made until such bonds or coupons shall have been validated pursuant thereto.

[4 U.S.T. 522, 527 (1953).]

From our consideration of the foregoing it is our opinion that the London Agreement and Annex I contemplated the making of an offer or proposal by the Federal Republic of Germany for: (1) A continuation and extension to the maturity date, October 15, 1969, of the full amount of the principal of the indebtedness represented by the old bonds which had matured on October 15, 1949, and upon which interest would be paid at the rate of 5½ percent per annum with the first interest payment to be on the first coupon date after March 31, 1953, or here April 15, 1953, and (2) a recalculation of interest arrears on the old bonds due to December 31, 1944, and payment of such recalculated interest in 20-year bonds bearing interest at the rate of 3 percent per annum with the interest payments thereon beginning on April 15, 1953. Such being the situation an owner of old bonds who accepted the offer or proposal would continue as the owner of the indebtedness

represented by the amount of the principal of his bonds and where as here there were interest arrears thereon which were due on or prior to December 31, 1944, such interest would be recalculated and the amount of recalculated interest would be paid in 20-year bonds bearing interest at the rate of 3 percent per annum with the interest due dates to begin on April 15, 1953. Such arrangement would effect a settlement and payment of interest arrears due on or prior to December 31, 1944.

Since the treaty provided that acceptance of the offer by a bondholder could be effected by submitting old bonds: (1) For exchange, if new bonds or coupons are issued, or (2) for enfacement, if the settlement is to be enfaced on the old bonds, and since Annex I contained similar provisions and indicated that the procedure followed would be dependent upon the election of the bondholder and the possible convenience to him as well as the custom prevailing in the several markets in which the bonds were originally issued, it appears that the only consideration prompting an exchange of old bonds for new bonds would be the convenience of marketability, if any, of the latter over the old bonds with the settlement terms enfaced thereon. Such being the situation, the fact that the petitioner exchanged its old bonds for new bonds would appear to be without determinative significance here.

Since the petitioner's old bonds were not transferred until during 1958, apparently due to the fact that the originals thereof had been lost and that time was required to obtain a judicial determination of that fact and obtain the validation of substitute bonds therefor, the fact remains that petitioner nevertheless continued as owner of the indebtedness represented by the amount of the principal of the bonds and the party to whom it was owing and as such it was entitled to receive all the interest accruing on the bonds even though under the provisions of section 127 of the Code of 1939 it had sustained a war loss on the bonds in 1941.

As we pointed out in *Fall River Electric Light Co.*, 23 B.T.A. 168 (1931), interest on indebtedness is the compensation allowed by law or fixed by the parties for the use or forbearance or detention of money. Accordingly, in view of what has been said above and since at all times material herein the petitioner continued to be the owner of and the party to whom was owing the principal amount of the indebtedness originally represented by the old bonds and later represented by the new bonds, we are of the opinion and so hold that the amount received by petitioner in 1958 as interest on the new bonds due on April 15, 1953, through April 15, 1958, $90,750, and the amount accrued as interest on the new bonds from April 15, 1958, to May 23, 1958, $1,650, constituted interest to the petitioner in 1958. We further hold that (1) the $45,000 face value of funding issue bonds received by petitioner in

1958 for interest due on the old bonds on April 15, 1942, through October 15, 1944, to the extent of their fair market value of $39,150, (2) the amount received by petitioner in 1958 for interest on such funding issue bonds due on April 15, 1953, through April 15, 1958, $7,425, and (3) the amount accrued as interest on such funding issue bonds from April 15, 1958, to May 22, 1958, $135, constituted interest to the petitioner in 1958.

Interest on indebtedness received by a taxpayer to whom the indebtedness is owing is ordinary income and not capital gain. *Commissioner* v. *Gillette Motor Transport, Inc.*, 364 U.S. 130 (1960); *Jaglom* v. *Commissioner*, 303 F. 2d 847 (C.A. 2, 1962), affirming 36 T.C. 126 (1961); *First Kentucky Co.* v. *Gray*, 309 F. 2d 845 (C.A. 6, 1962).

In reaching the foregoing conclusions we have considered a contention made by the petitioner that it exchanged its old bonds for new bonds of identical face value, plus $45,000 face value funding issue bonds, plus interest arrearages, plus Talons; that such transaction is the equivalent of a purchase of bonds "flat"; and that accordingly the interest arrearages to the date of "purchase" should be treated as a return of capital. The petitioner's contention overlooks the fact that at all times material herein the petitioner was the owner of and the party to whom was owing the principal amount of the indebtedness, $300,000, originally represented by the old bonds and later represented by the new bonds. As such owner and party the petitioner was entitled to receive interest on the bonds as it became due on the stated dates of April 15 and October 15 until the maturity date of the bonds, October 15, 1949. By the transfer of its old bonds petitioner elected to accept the terms of the arrangement provided for in the London Agreement and Annex I. Such arrangement provided with respect to interest which became due on the old bonds on April 15, 1942, through October 15, 1944, that the recalculated amount thereof should be paid in funding issue bonds bearing interest at the rate of 3 percent per annum with the interest due dates to begin on April 15, 1953. Obviously the petitioners' acquisition of $45,000 face value funding issue bonds under such an arrangement is not the equivalent of a "purchase" of bonds "flat" irrespective of the fact that petitioner, due to the delay inherent in its circumstances, did not receive such bonds and the interest, becoming due thereon on April 15, 1953, and subsequent due dates, until in 1958.

We also have considered a further contention of the petitioner to the effect that since the stipulated fair market value of its old bonds with a face value of $300,000 was $438,000 on May 22, 1958, and the new bonds with a like face value had a stipulated fair market value of $306,000 on the same date, we should conclude that no prudent

businessman would have exchanged the old bonds for the new bonds and that it (petitioner) did not make such an exchange.

At this point we observe that the stipulation filed by the parties reads as follows respecting the fair market value of the old bonds and of the new bonds on May 22, 1958:

27. On May 22, 1958 the $300,000 German External Loan 1924 7% bonds, due October 15, 1949, had a fair market value of $438,000, computed as follows: ($300,000×146)

28. On May 22, 1958 the $300,000 German External Loan 1924—Federal Republic of Germany—Extension Issue 1953, 5½% Dollar Bonds, due October 15, 1969, had a fair market value of $306,000, computed as follows: ($300,000×102)

From the foregoing we have been unable to find that the old bonds and the new bonds had the fair market values of $438,000 and $306,000, respectively, as set forth in the foregoing quoted matter because the qualifications attached thereto render the amounts meaningless. The parties have not cited us to any rule nor do we know of any whereby fair market values can be correctly determined by the mere multiplication of unexplained multiplicands by unexplained multipliers.

If, despite the foregoing, it be assumed that on May 22, 1958, the fair market value of the old bonds was $438,000 and that of the new bonds was $306,000, it would appear that there was some rather substantial reason or reasons for the large difference of $132,000 between the two amounts. However, the petitioner has not given us an explanation for such difference in values and declining to speculate in the matter, we merely conclude that we are without basis for determining what a prudent businessman would have done under the situation presented herein. The record herein shows what the petitioner did but the reason or reasons therefor are known only to those responsible for its actions.

*Decision will be entered under Rule 50.*