## ROZENFELD v. COMMISSIONER OF INTERNAL REVENUE.

### No. 146, Docket No. 21494.

United States Court of Appeals Second Circuit

Argued March 1, 1950.

Decided April 3, 1950.

Louis Haimoff, New York City, for petitioner.

Chas. Oliphant, Theron L. Caudle, Wash-ington, D. C., Carlton Fox, Washington, D. C., Ellis N. Slack, Helen Goodner, Sp. Assts. to the Atty. Gen., for respondent.

Before L. HAND, Chief Judge, and GOODRICH and FRANK, Circuit Judges.

L. HAND, Chief Judge.

The taxpayer, Rozenfeld, has appealed—petitioned to review—an order of the Tax Court, assessing against him a deficiency on his income tax for a fiscal year, which ended November 30, 1942. The only question of which he complains is the disallowance of a deduction which he claimed as a war loss, authorized by Section 127(a) (2) of the Internal Revenue Code, as amended in 1942.[1] He was a Pole who fled from that country in 1939 before the advance of the German army, and has now become a citizen. The case was tried upon stipulated facts, the substance of which is as follows. From the year 1930 onwards the taxpayer had owned a ribbon factory in the City of Lodz, Poland, seized about September 1, 1939, by the "German army." The "Germans," having taken it over, enlarged and improved the factory, and continued in possession of it until January, 1945, when they were driven out, presumably by the Russians; and during the whole period from September 1, 1939, till January, 1945, the taxpayer had neither possession nor control of the factory. In February, 1945, the "Polish Office of Temporary Management" took it over, and on January 28, 1947, the "Municipal Commission for Nationalization in Lodz" nationalized it. In the words of the agreed statement of fact: "the records of the Polish Government indicate that title to said factory was in the petitioner after the expulsion of the Germans in January, 1945." The critical question is whether on the date when war was declared with Germany—December 11, 1941—the taxpayer continued to have an interest in the property, whose seizure or destruction could be considered a loss.[2]

1. Sec. 127 (a) (2), Title 26 U.S.C.A. "Property in enemy countries. Property within any country at war with the United States, or within an area under the control of any such country on the date war with such country was de-clared by the United States, shall be deemed to have been destroyed or seized on the date war with such country was declared by the United States."

2. Sec. 127 (a) (2), Title 26 U.S.C.A.

The Tax Court held that, "when petitioner lost control and possession of the property in 1939, his loss of the property was for all practical purposes complete. Any value which might be assigned to his legal title and right to eventual return of the property, was purely conjectural in 1939, since at that time petitioner had no assurance of the continued existence of the property, or of when, if ever, he might remove it." For this reason it refused to allow the deduction.

The Tax Court has in two earlier decisions held that the section presupposes that the taxpayer must have "ownership" of the property on December 11, 1941, and that the burden of proof rests upon him so to prove.[3] Just what is involved in "ownership" is not altogether clear; especially whether the seizure of property by an invading army and its later use and operation constitutes a loss of it. In In Re Bloch[4] the question arose as to certain personal property, left in the taxpayer's Paris apartment in June, 1940, and found by him upon his return in April, 1946. The Tax Court held that "the Germans" must have seized the property before December 11, 1941, because they had occupied Paris in June, 1940, and perhaps it assumed that this seizure deprived the taxpayer of "ownership" in the sense required. However, that is not an inevitable interpretation of the opinion, which we adopted as our own when we affirmed the order.[5] It would have been altogether consistent with the preceding decisions to dispose of the case on the ground that, even though seizure alone does not divest "ownership," the taxpayer had not carried the burden by proving additional facts which showed that he had in fact not lost his "ownership."

It had long been the practice of civilized nations not to confiscate the goods of enemy nationals; we ourselves originally so proceeded in the first war with the Central Powers. We sequestered all enemy property and at times we sold it, but that, in theory anyway, was only to preserve it, as a trustee might preserve it; and accordingly we gave the Alien Property Custodian the powers of a trustee. It is true that we did not in the end adhere to this, for we applied the proceeds to our claims against the enemy governments; moreover, the authorities are not now in agreement as to how far the old doctrine survives. We are not forced to decide that question, for even under the original doctrine the taxpayer has failed to prove that he still had "ownership" of the factory on December 11, 1941. That turns upon two questions: first, whether the stipulation is to be understood to mean that the title had never been taken from him; second, whether, if so, title and "ownership" are synonymous. The answer to the first of these questions seems to us reasonably clear; the burden of proof was not so heavy as to require the taxpayer to go beyond what the Polish records showed. The Tax Court itself so agreed, for it declared: "Petitioner did own the rightful legal title to the property throughout the entire period of 'unlawful' German occupation of it." The second question is more troublesome: can a taxpayer lose "ownership" of his property and yet keep title? As appears from the passage, which we quoted from the opinion of the Tax Court, that court held that he could; and we believe that this follows from the decision of the Supreme Court in United States v. White Dental Co.,[6] which arose after the War of 1914.

The Germans had seized a factory in Germany under a sequestration statute, which the Court said, was *pari passu* the same as our Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 1 et seq., and which, if so, merely put a sequestrator in possession, as a trustee. He had however wasted some of the assets, and had invested other parts in German bonds, so that very little remained. So far as appears, the "title" had never passed out of the owner; and that the Court certainly thought irrele-

3. Adler v. Commissioner of Internal Revenue, 8 T.C. 726. Heckett v. Commissioner of Internal Revenue, 8 T.C. 841.

4. 6 Tax Court Memo, Decisions 408.

5. Bloch v. Commissioner, 2 Cir., 166 F.2d 1022.

6. 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120.

vant, as appears from the following passages in 274 U.S. on page 402, 47 S.Ct. on page 600 of the opinion "As a result of a sequestration" the company "was left without property or assets." The sequestration "left the corporation without right to demand its release or compensation for its seizure, at least until the declaration of peace. * * * What would ultimately come back to it * * * might be secured, not as a matter of right, but as a matter either of grace to the vanquished or exaction by the victor. In any case the amount realized would be dependent upon the hazards of the war then in progress." The statute contemplated "that a loss may become complete enough for deduction without the taxpayer's establishing that there is no possibility of an eventual recoupment." We understand from this that the test is a practical one, and does not depend upon an absolute forfeiture of all legal right. Nor can we agree to the distinction suggested by the taxpayer; that the seizure in that case was lawful, being made under German law—the property being situated in that country—while in the case at bar the factory was seized without warrant of any law. The relevant consideration, as we understand the Supreme Court, is not the legal consequences of the seizure, but how completely the owner is dispossessed: i. e., the remoteness of any recovery of the property or its proceeds. After all, that is a sensible test of whether he has suffered a loss, which should be deducted. The reason for drawing a line at our declaration of war was, we apprehend, that after our nationals had become enemies, it would not be possible to learn the date at which their property had been seized; but that until then they had some means of doing so. That was perhaps somewhat harsh, even though seizure was the equivalent of loss of "ownership," for communication was difficult enough for neutrals at best. But to insist upon their learning whether the enemy powers had succeeded in divesting our nationals of their titles was an impossible task. We cannot think that that is what was meant by the word, "seizure."

It is quite true that the Regulation [7] uses the word "confiscated," and it must be owned that in common usage that implies the transfer of legal title. However, in the light of the only ruling of the Supreme Court and of what we have just said, we do not think that the choice of this as an equivalent of the word, "seized," in the section, ought to be taken as indicating a departure from the earlier established meaning.

Order affirmed.

7. Regulation 103, § 19.127(a)—1.