674

**Henry H. SONNENBERG, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

United States District Court
S. D. New York.
May 23, 1958.

Sher & Roeder, New York City, for plaintiff.

Paul W. Williams, U. S. Atty. for S. D. New York, New York City, for defendant (William Stackpole, Asst. U. S. Atty., New York City, of counsel).

LEIBELL, District Judge.

Preliminary Statement

This is an action for a refund of plaintiff's 1941 income tax of $44,-369.01 with interest thereon. The claim is based upon Sections 127 and 23 of the Internal Revenue Code of 1939 as amended, 26 U.S.C.A. §§ 127, 23. Section 127 relates to war losses and their deduction in calculating taxable net in-

come.[1] This Court has jurisdiction of the action by virtue of Sections 1340 and 1346 of Title 28 U.S.C., 62 Stat. 932 and 933. The collector of internal revenue to whom the tax was paid was not in office as collector when the action was commenced. The United States of America has properly been named as the defendant. Buhl v. Menninger, 6 Cir., 251 F. 2d 659, 660; T. 28 U.S.C.A. § 1346(a) (1).

At the trial two experts on German law testified concerning the German decree of January 15, 1940, issued by the Ministerial Council for Reich Defense, and the circular decrees or regulations promulgated thereunder, in relation to the handling of enemy property in Germany. Dr. Steefel testified for the plaintiff and Dr. Oppenheimer for the defendant. The deposition of the plaintiff, taken January 17, 1958, was received as plaintiff's Exhibit III. The plaintiff was in Europe at the time of the trial March 10–11, 1958. The deposition on written interrogatories of Dr. Wirtz, plaintiff's agent and lawyer in Germany, was also offered and received as a plaintiff's exhibit. Certain exhibits attached to the Wirtz deposition were put in evidence, some of them by the defendant.

The Barton Machinery, Ltd., a British corporation, owned directly and indirectly the stock of certain German corporations, two of which were operating corporations, manufacturing machinery and machine tools. Plaintiff through an agent (Lindars) owned all the outstanding shares of stock of Barton Machinery, Ltd.

It is plaintiff's contention that his interest in the shares of Barton Machinery, Ltd., had a substantial value, at least $99,700.83, the cash cost of his shares, immediately prior to December 11, 1941, but that such interest became worthless on December 11, 1941, when the United States declared war on Germany, and that his claim thus comes within the purview of Section 127(a) (3) of the Inter-

---

1. "§ 127. War losses.
    "(a) Cases in which loss deemed sustained, and time deemed sustained. For the purposes of this chapter—

    \*     \*     \*     \*     \*     \*

    "(2) Property in enemy countries. Property within any country at war with the United States, or within an area under the control of any such country on the date war with such country was declared by the United States, shall be deemed to have been destroyed or seized on the date war with such country was declared by the United States."
    "(3) Investments referable to destroyed or seized property. Any interest in, or with respect to, property described in paragraph (1) or (2) (including any interest represented by a security as defined in section 23(g) (3) or section 23(k) (3)) which becomes worthless shall be considered to have been destroyed or seized (and the loss therefrom shall be considered a loss from the destruction or seizure) on the date chosen by the taxpayer which falls between the dates specified in paragraph (1), or on the date prescribed in paragraph (2), as the case may be, when the last property (described in the applicable paragraph) to which the interest relates would be deemed destroyed or seized under the applicable paragraph. This paragraph shall apply only if the interest would have become worthless if the property had been destroyed. For the purposes of this paragraph, an interest shall be deemed to have become worthless notwithstanding the fact that such interest has a value if such value is attributable solely to the possibility of recovery of the property, compensation (other than insurance or similar indemnity) on account of its destruction or seizure, or both. Section 23(g) (2) and (k) (2) shall not apply to any interest which under this paragraph is considered to have been destroyed or seized. Under regulations prescribed by the Commissioner with the approval of the Secretary, a taxpayer which owns 100 per centum (excluding qualifying shares) of each class of stock of a corporation may elect to determine the worthlessness of its interest, described in this paragraph, in or with respect to the property of the corporation, without regard to the amount of the property of such corporation which would be excluded under subsection (e) (2) (A) in determining the adjusted basis of all the assets of the corporation for the purposes of subsection (e), but such amount shall be treated under subsection (b) (1) as recovery by the taxpayer in the taxable year with respect to such interest."

nal Revenue Code as a war loss. If recognized as a proper deduction, the amount of the war loss would exceed the 1941 taxable income, on which plaintiff paid a tax; and he would be entitled to the refund claimed.

The Government contends that plaintiff's interest in the shares of Barton Machinery, Ltd., a British corporation, had become worthless when England declared war on Germany in September 1939, or sometime thereafter but prior to December 11, 1941, and therefore plaintiff had nothing to lose when the United States declared war on Germany on December 11, 1941. Without his claimed war loss as a deduction, plaintiff would be entitled to no tax refund.

. After a careful examination of the evidence, the depositions, documents and the trial record, I have concluded that the Government's contention is correct. The following constitute my findings of fact and conclusions of law, to which I have annexed a discussion of the evidence, the statute, Section 127(a) (2) and (3) of the 1939 Internal Revenue Code, and the controlling decisions of our courts.

### Findings of Fact

1. The Court takes judicial notice of the following historical facts as a background, against which many of the findings of fact concerning the German corporations, their assets, plaintiff's indirect interest therein and the German decrees and action in relation thereto, should be considered.

(a) Britain and France guaranteed the integrity of Poland on March 31, 1939. Germany invaded Poland September 1, 1939. Britain declared war on Germany September 3, 1939. France followed suit.

(b) Germany invaded Belgium and Holland May 10, 1940, and attacked the French line.

(c) The British Expeditionary Force was evacuated from Dunkirk, May 27, 1940 to June 4, 1940. Italy declared war on Britain and France on June 10, 1940. Paris was taken by the Germans June 14, 1940. The Petain government in France asked Germany for an armistice on June 16, 1940. Churchill made his speech of defiance of Germany calling on all Britains to fight on (the "This was their finest hour" speech), on June 18, 1940.

(d) The air battle for Britain was started by Germany early in August 1940 and continued into the month of October. Its turning point in favor of Britain was about mid-September, 1940.

(e) Germany invaded Russia in June 1941.

(f) The Japanese attacked the United States at Pearl Harbor on December 7, 1941. On December 11, 1941, the United States declared war on Germany.

(g) Germany surrendered unconditionally May 8, 1945.

2. The plaintiff became a citizen of the United States in November 1946. He is a resident of Bronx County, New York City.

3. The plaintiff filed his federal income tax return for the calendar year 1941 on or about March 14, 1942. Said return showed taxable net income in the amount of $89,692.55 and a total income tax due thereon of $44,373.01 of which $44,369.01 was paid by the plaintiff to the collector of internal revenue. In arriving at said taxable net income of $89,692.55 the plaintiff did not deduct from gross income any amount on account of or with respect to any war loss under Section 127 of the Internal Revenue Code of 1939, which said section was not enacted until October 21, 1942. Plaintiff subsequently filed a claim for refund of the tax paid.

4. Barton Machinery, Limited, hereinafter referred to as Barton, was incorporated under the laws of England on July 25, 1933 with an authorized capital stock of £15,000 divided into 15,000 shares of £1 each; and in January 1936, the capital stock of Barton was increased to £30,000 by the creation of 15,000 additional shares of £1 each, ranking in all respects pari passu with the existing shares.

5. From June 29, 1938 until after July 12, 1951 the outstanding capital stock of Barton consisted of 18,502 shares

which had been issued and paid for in cash at the rate of £1 per share.

6. Herman Lindars, hereinafter referred to as Lindars, was at all times relevant hereto a British citizen and resident. On July 23, 1937, and until July 12, 1951, he was the registered holder of 14,001 shares of the 16,502 shares of the capital stock of Barton issued and outstanding in July 1937. Said 14,001 shares had been paid for by the plaintiff in cash at the rate of £1 per share as follows:

| | |
|---|---|
| August 14, 1933 | £ 2,500 |
| August 16, 1933 | 1 |
| January 11, 1936 | 3,829. 7.3 |
| February 1, 1936 | 7,670.12.9 |
| Total | £14,001. 0.0 |

Lindars at all times held said shares for and on behalf of the plaintiff and was paid for whatever work he did.

7. On June 28, 1938 Lindars acquired 2,500 additional shares of Barton from "Laagland", a Dutch corporation owned by plaintiff, for which Lindars paid £4,300 in cash; and on the same date he acquired 2,000 additional shares from Barton for £2,000 in cash. In making these further acquisitions of Barton stock, Lindars was acting for and on behalf of the plaintiff and utilizing funds which were made available to him by or on behalf of the plaintiff. The said additional 4,500 shares of Barton stock were held, from June 28, 1938 to July 12, 1951, in the name of Lindars, who acted as agent for and on behalf of the plaintiff and was paid for whatever work he did.

8. The net profit of Barton for the period January 1, 1939 to August 31, 1939 was £3.1.8. For the period September 1, 1939 to December 31, 1941 Barton had a small net loss, consisting of bank charges and sundry expenses of £2.7.6.

9. On December 11, 1941 Barton, according to its books, had the following assets and liabilities:

| | In English pounds |
|---|---|
| Cash | £ 10. 3.6 |
| Receivables | 34. 5.1 |
| Formation expense | 136.17.1 |
| Total | 181. 5.8 |
| Less payables | 86.15.6 |
| Excess of assets over payables | 94.10.2 |

All other assets—direct ownership of 65 per cent. of the capital stock of a German corporation referred to as I.V.*

50 per cent. of the capital stock of a German corporation referred to as Eisenwerke Reisholz, later known as Maschinen

79 shares of the capital stock of a German corporation referred to as W.Z.W.

---

* The actual names of the four German corporations involved herein are Industrie-Verwaltungs-Aktingesellschaft; Westdeutsche Werkzeugmaschinen Aktiengesellschaft; Wotan-und Zimmermannwerke Aktiengesellschaft and Maschinenverwertungs-Gesellschaft m.b.h. They are referred to herein as I.V., Wewag, W.Z.W. and Maschinen, respectively.

The formation expense, although shown as an asset, was actually a capitalized expense representing no assets; and the payables represented petty cash items due to creditors in England.

Because of cross holdings of stock by I.V., Maschinen and their subsidiaries, the actual participation, direct and indirect, of Barton in I.V. and Maschinen amounted to over 90 per cent. and 100 per cent., respectively. These two corporations, in turn, owned all of the outstanding shares of a German corporation known as Wewag and 90 per cent. of the shares of a German corporation known as W.Z.W.

10. Barton had acquired the aforesaid shares of I.V., which it owned directly, by purchase for £25,000 on July 28, 1933 from "Laagland", a Dutch corporation completely owned by Sonnenberg. The certificates representing said shares of I.V. stock are in bearer form and from about July 1933 until March 7, 1952 were held continuously in physical custody for Barton by a bank in London.

11. Wewag and W.Z.W. were German corporations organized prior to July 28, 1933 and, at all times relevant hereto, were engaged in the business of manufacturing and selling machine tools in Germany. Until 1938 Wewag's corporate name was Heinrich Sonnenberg Aktiengesellschaft. I.V. was a German corporation organized prior to July 28, 1933 and, until 1931 or 1932, when it became a holding company the assets of which consisted of Wewag and W.Z.W. shares, it had been engaged in the manufacture and sale of machine tools in Germany. Maschinen was a German corporation organized in 1905 and had been engaged in the machine and machine tool business. From prior to and on December 11, 1941 it was not engaged in active business operations. There is no proof in the record as to where the shares of stock of Wewag and W.Z.W. were physically located in 1939 or at any time subsequent thereto.

12. The tables below show the sales and net profit of Wewag for each of the years 1938 to 1943, inclusive, and its condensed balance sheet as at the end of each of said years, according to its books.

### Sales and net profit of Wewag
#### (In German Reichsmarks)

| Year | Sales | Net profit |
|------|-------|-----------|
| 1938 | RM7,098,535.61 | RM589,511 |
| 1939 | 7,794,411.54 | 185,551 |
| 1940 | 8,420,773.49 | 41,783 |
| 1941 | 7,846,418.32 | 113,297 |
| 1942 | 7,673,584.39 | 137,492 |
| 1943 | 5,841,730.37 | 138,910 |

### Condensed balance sheets of Wewag
#### (In German Reichsmarks)

| December 31 | Plant and equipment | Current assets | Liabilities | Capital stock | Surplus |
|-------------|--------------------|----------------|-------------|---------------|---------|
| 1938 | RM633,383 | RM3,201,053 | | | |
| 1939 | 622,537 | 4,129,911 | RM1,310,154 | RM1,000,000 | RM2,442,294 |
| 1940 | 631,953 | 4,479,958 | 1,193,428 | 1,000,000 | 2,918,483 |
| 1941 | 519,136 | 4,760,889 | 1,168,859 | 3,000,000 | 1,111,166 |
| 1942 | 385,918 | 5,069,863 | 1,013,380 | 3,000,000 | 1,442,401 |
| 1943 | 396,675 | 5,063,124 | 761,720 | 3,000,000 | 1,698,079 |

13. The table below shows the net profit of Maschinen, I.V. and W.Z.W., respectively, according to their respective books, for the years 1940 to 1943.

Net profit of Maschinen, I.V. and W.Z.W.

(In German Reichsmarks)

| Year* | Maschinen | I.V. | W.Z.W.** |
|-------|-----------|------|----------|
| 1940 | (4,966.02) | 34,693.50 | |
| 1941 | (29,974.60) | 59,242.79 | |
| 1942 | (3,360.25) | 189,343.16 | 31,787.37 |
| 1943 | (4,009.65) | 308,432.06 | 141,986.90 |

———◇———

14. The tables below show the condensed balance sheets of Maschinen, I.V. and W.Z.W., respectively, according to their respective books, as of the end of their fiscal years.

Condensed balance sheets of Maschinen, I.V. and W.Z.W.

(In German Reichsmarks)

| Date | Total assets | Liabilities | Capital stock | Surplus |
|------|-------------|-------------|---------------|---------|
| Maschinen (As of December 31) | | | | |
| 1940 | 492,672.25 | 422,456.43 | 2,000,000 | (1,929,784.18) |
| 1941 | 466,219.49 | 425,978.27 | 2,000,000 | (1,959,758.78) |
| 1942 | 462,271.42 | 425,390.45 | 2,000,000 | (1,963,119.03) |
| 1943 | 459,418.14 | 426,546.82 | 2,000,000 | (1,967,128.68) |
| I.V. (As of June 30) | | | | |
| 1941 | 3,238,931.39 | 65,048.48 | 735,000 | 2,438,882.91 |
| 1942 | 3,381,072.87 | 17,846.80 | 735,000 | 2,628,226.07 |
| 1943 | 4,015,155.69 | 343,003.56 | 735,000 | 2,937,152.13 |
| W.Z.W. (As of June 30) | | | | |
| 1943 | 8,849,664.68 | 1,354,591.82 | 2,500,000 | 4,995,072.86 |
| 1944 | 8,040,983.43 | 1,535,189.89 | 2,500,000 | 4,005,793.54 |

———◇———

15. The shares of Barton had no market value in 1941. They were not listed on any stock exchange nor were there any outstanding offers to buy them. Plaintiff's own evaluation of the Barton stock is based solely on its ownership, directly or indirectly, of the shares in the four German companies. While there is proof that the assets of the German companies had value in Germany, Barton could not reach those assets after September, 1939 when war between Germany and England intervened.

16. On September 3, 1939 and on December 11, 1941, all of the assets of the four German corporations were physically located in Germany and territories then occupied by Germany.

* Calendar years for Maschinen and fiscal years ending June 30 for I.V. and W.Z.W.

** The figures for W.Z.W. for 1940 and 1941 are not now available.

17. The plaintiff was born in Germany August 18, 1895. In June 1933 he left Germany where he resided and went to Holland where he then established his home. On March 25, 1939 he became a citizen of Holland by a legislative act of the Kingdom of the Netherlands. In February 1940, the plaintiff emigrated to Canada; and on January 1, 1941, he entered the United States as a quota immigrant. On November 20, 1946, plaintiff, as a prior citizen of The Netherlands, became a citizen of the United States through naturalization. He has resided continuously in the United States since January 1, 1941.

18. Dr. Heinrich Wirtz is a practising German lawyer in Dusseldorf, Germany, and has been such since 1911. During the period prior to 1939, he was President of the Supervisory Boards of I.V., Wewag and W.Z.W., and in that capacity he acted as Sonnenberg's agent in Germany. He was the only person in Germany who knew of the plaintiff's interest in Barton. He had no contact with plaintiff after the outbreak of war between Germany and England in the autumn (September) of 1939, and his powers as President of the Supervisory Board of Wewag and W.Z.W. were suspended by the appointment of an Administrator for those companies in July and August, 1940, respectively, pursuant to the terms of the German Enemy Property Decree of January 15, 1940, and the regulations or circular decrees, supplementary thereto, although he continued on the Board. He was subject to the Administrator, Zucker.

19. A state of war between Germany and England existed from and after September 3, 1939; and between the United States and Germany on and after December 11, 1941. This war status continued until at least May 8, 1945 when the German military forces executed an unconditional surrender.

20. On January 15, 1940, the German Government issued a "Decree concerning the Treatment of Enemy Property". This decree was supplemented by three circular decrees or regulations of the German Minister of Justice, dated June 20, 1940, September 17, 1940 and January 20, 1941. These decrees governed the treatment of property in Germany owned, either directly ("enemy property") or indirectly ("under decisive enemy influence"), by enemies of Germany. Although these decrees were not formally repealed until 1951, the Allied Military government authorities effectively vitiated them by Military Government Decree No. 52 (issued in 1946), which did two things: (1) it made all property treated as enemy property, or enemy-controlled property under the German decrees, Allied property, and (2) it eliminated all the machinery set up by the Germans for dealing with this property, including the Administrators appointed for individual companies by the German courts.

Section 9 of the January 15, 1940 basic decree effectively blocked all enemy property in its existing ownership; none of this property could be transferred except by the Administrator appointed under Section 12. Section 12 provided for the appointment of an Administrator of German enterprises "directly or indirectly under decisive enemy influence". Such Administrator was appointed by the local Court of Appeal in an *ex parte* proceeding brought by the Reichs-Kommissar for Enemy Property; the owner was not represented nor were the shareholders consulted. The Reichs-Kommissar was a German government official in charge of the administration of all enemy property; the Administrator was appointed for individual companies. The Court's powers with respect to this appointment were mainly formal and procedural; the Reichs-Kommissar alone could determine whether property was under decisive enemy influence and whether the appointment of an Administrator was necessary. The shareholders of any company affected could not review these decisions in any way, nor could they remove the Administrator appointed. The individual Administrator appointed took over the functions of the "organs" (the officers, the board of directors, the stock-

holders) of the company; in fact, those organs were specifically suspended by Section 14 of the decree of January 15, 1940.

21. The German shares owned by Barton constituted enemy controlled property within the meaning of the basic decree of January 15, 1940. The German companies controlled by Barton, directly or indirectly, and the assets of those companies were, according to this German decree, under "decisive enemy influence". All these German companies owned by Barton were subject to the terms of the decree. As a result, an Administrator, Karl Zucker, was appointed by the German courts on the request of the Reich Commissar, for Wewag on July 20, 1940 and for W.Z.W. on August 3, 1940. No Administrator was appointed for I.V. and Maschinen since both were holding (not operating) companies, and such an appointment was unnecessary.

Zucker had previously been a member of the Supervisory Boards of I.V., Wewag and W.Z.W. He was familiar with the financial affairs and manufacturing operations of Wewag and W.Z.W. He was well qualified to act as Administrator of both, representing the Reich Commissar by whom he was selected for the post. It was a purpose of the German decree of January 15, 1940 and of the circular decrees or regulations supplemental thereto, to secure and preserve the enemy owned property and to conserve those economic assets for the benefit of the German economy, a war economy. The operating companies, Wewag and W.Z.W., manufactured machines and machine tools, a business that was important to a nation engaged in a war, as Germany was from September 1939 through 1940, 1941 and for several years thereafter, down to May 1945.

22. The basic German decree of January 15, 1940 and the decrees or regulations supplementary thereto, in particular those of June 20 and September 17, 1940, effectively deprived Barton, and through Barton, the plaintiff, of ownership and control of the German corporations in 1940, over a year prior to December 11, 1941, when the United States declared war on Germany. The whole purpose underlying the formation of Barton by plaintiff was to enable plaintiff to control the German companies through Barton, while concealing the plaintiff's ownership from the German government. At the outset of the Second World War in September, 1939, the British Trading with the Enemy Act forbad all contact between Barton, as a British corporation, and Germany. It was an offense for any officer of Barton or any resident of England or Canada to have any dealings with Germany after that date.

Moreover, the promulgation of the basic German decree of January 15, 1940, the decrees and regulations supplementary thereto, and the appointment of Mr. Zucker as Administrator for Wewag and W.Z.W. in July and August 1940, completely vitiated, as a practical matter, all the rights which would have normally vested in Barton as the controlling shareholder in the four German companies. The most important of these rights were the right to vote the German shares at any shareholders' meeting, the right to elect the members of the supervisory board, the right to receive dividends, and the right to dispose of the shares. None of these rights remained in Barton after the effective date of the basic German decree, January 15, 1940.

In addition, the Administrator appointed for Wewag and W.Z.W. had broad administrative powers. Under Section 14 of the January 15, 1940 decree, the powers of the manager and representative of management were "suspended during the administration". The Administrator could, with a license from the Reich Commissar and, in certain cases, with the additional approval of the Court of Appeal, (a) sell or liquidate the assets which he administered, (b) sell any participations owned by his companies in other companies, (c) increase the capital of the companies, and (d) change the by-laws of the companies, all without approval of, or consultation with, the shareholders. The shareholders were

powerless to review any decisions made by the Reich Commissar and the Ministry of Justice. There are no specific provisions of the basic or supplementary decrees which limit the Reich Commissar's power to license, or which specify the circumstances under which he may license sales and liquidations.

In at least one instance, Mr. Zucker, the Administrator, ordered certain marketable stock holdings in independent undertakings owned by Wewag and W.Z.W., to be sold on the stock exchange.

In a business report dated December 12, 1941, (Exh. D), Zucker, as Administrator of Wewag, stated that pursuant to Section 8 of the dividend tax regulations of June 12, 1940, he had caused the capital stock of Wewag to be increased from RM 1,000,000 par value to RM 3,000,000 par value as of December 31, 1940. The adjustment was made by issuing two thousand additional shares at RM 1,000 each. The additional shares were to be name shares. It was provided that each old share of RM 1,000 entitled the holder to two new shares of RM 1,000 each. Zucker then declared a four per cent dividend on the increased capital stock of RM 3,000,000 for the business year 1940, on which the German Government imposed a dividend tax levy. Other than that there is no proof of what was done with the dividend.

The Administrator's discretionary powers were only limited by the general intent of the decree, which refers vaguely to safeguarding and preserving the property. The decree does not define the interest for whom the property is to be preserved, but when the decree is viewed in its contemporary context, it becomes clear that this was to be done for the German defense economy and defense effort, nor for the enemy owner in England. Such broad and discretionary powers are inconsistent with the retention of any control or rights of ownership by Barton or the plaintiff in respect to the physical assets of the German corporations, whose shares of stock were owned by Barton, either directly or indirectly. Zucker was removed as Administrator of Wewag by the Allied Military Government June 2, 1945.

23. As a practical matter, Barton and the plaintiff lost control of the German companies when war between Germany and England commenced in September, 1939. Lindars had no contact with Germany after that date, and Wirtz had no contact with Sonnenberg thenceforth. Zucker, the Administrator, complied with the German decrees. There is no basis for any assumption that Dr. Wirtz did not do so. The fact that Dr. Wirtz and Zucker had formerly been on the Board of Supervisors of the German corporations did not lodge in plaintiff any form of control over the German corporations and their assets in Germany, from September 3, 1939, when Britain declared war on Germany up to December 11, 1941, when the United States declared war on Germany. Under the German decree of January 15, 1940 and the circular decrees or regulations, and after the appointment of Zucker, as Administrator of Wewag and W.Z.W., Barton and plaintiff were dispossessed of the rights attaching to ownership of the shares of stock of the German corporations and the physical properties and assets of the German corporations.

24. At no time during 1941 did the plaintiff have any recovery or receive anything with respect to the Barton stock outstanding or with respect to the German corporations by way of insurance, or other indemnity, or otherwise by reason of the declaration of war, or on account of the loss.

25. The possibility of recovery by the plaintiff or by Barton by insurance or indemnity or in any other manner with respect to the German corporations or with respect to the Barton stock, exclusive of a possible recovery on the conclusion of war, had no value in September 1939 or at any time in the years 1939, 1940 and 1941.

26. At no time in the year 1941 was any indebtedness or other obligation of

the plaintiff satisfied or discharged in any way out of any of the property of the German corporations or his ownership of the Barton shares.

27. The plaintiff had no gains in 1941 from the sale or exchange of capital assets nor from the involuntary conversion of any property.

28. The cash cost of the Barton shares to the plaintiff in United States dollars, according to the proof in this case, was $99,700.83, computed as follows:

| Date | Cost in English pounds | Rate | Cost in U. S. dollars |
|---|---|---|---|
| 1933 | | | |
| August 14 | £2,500 | $4.43 7/8 | $11,096.88 |
| August 16 | 1 | 4.39 1/4 | 4.39 |
| 1936 | | | |
| January 11 | 3,829. 7.3 | 4.96 1/4 | 19,004.38 |
| February 1 | 7,670.12.9 | 5.00 3/8 | 38,381.88 |
| 1938 | | | |
| June 28 | 4,300 | 4.95 7/16 | 21,304.50 |
| June 28 | 2,000 | 4.95 7/16 | 9,908.80 |
| | | | $99,700.83 |

## Discussion

Dr. Ernest C. Steefel, called by plaintiff as an expert witness on German law, testified on direct examination that the basic decree of January 15, 1940, entitled "Enemy Property Decree" had as its purpose conservation and protection of enemy property and not the confiscation or transfer of legal title thereto, thereby leaving the enemy ownership intact, and that it did not "intend to dispossess the enemy owner of title or prohibit his dispositions except to the extent that they were contrary to the German economy."[2]

2. Title IV of the basic decree of January 15, 1940, was headed "Restrictions on Dispositions" and was made up of three sections designated Section 9, 10, and 11 of the decree which provided as follows:

"Section 9. *General Prohibition on Dispositions.* Enemy property in Germany cannot be disposed of. A disposition by way of execution, in particular execution of attachment or of a provisional injunction is equivalent to a disposition by act of the parties."

"Section 10. *Exceptions.* (1) The prohibition of dispositions under Section 9 is not applicable to dispositions already subject to restrictions under the Exchange Control Law of December 12, 1938 and Regulations for its Enforcement.

"(2) Nor is the prohibition of dispositions under Section 9 applicable to dispositions in Germany which are:

"1. required within the scope of current management of an enterprise or of real property or for the maintenance of a household;

"2. made with the approval of the court by a guardian, curator or other administrator appointed by a German court;

"3. made by an administrator appointed under section 12.

"(3) The Reich Minister of Justice with the concurrence of the Reich Minister of Finance may license further exceptions from the prohibition of dispositions under Section 9."

"Section 11. *Retroactivity.* No rights can be asserted as arising out of dispositions of property which is subject to the reporting requirement of Section 6 made after September 2, 1939 and prior to the coming into force of this decree. Section 10 applies mutatis mutandis. This does not affect the validity of dispositions allowed by the Reich Minister of Justice pursuant to Article 2, (5) of the Decree for the Reporting of Enemy Property of November 3, 1939."

In support of this Dr. Steefel read into the record statements appearing in a commentary by Krieger-Hefermehl, two main officials in charge of the administration of enemy property located in Germany, to the effect that "The purpose of the German regulation is to secure the assets operating in these enterprises to the extent that the economic values involved in these operating enterprises remain intact for the German economy. Over and above this, it is in the interest of the future peace settlement to change at least (as little) as possible the legal fate of the assets represented in the enterprise belonging to the enemy, for each change would be an anticipatory move towards the future peace settlement and the consequences cannot be foreseen at this time. For this reason the fifth chapter of the decree provides for the appointment of custodians and trustees for domestic enterprises which are under enemy influence.[3] However, they are not described as a custodian or trustee but as Administrator of the enterprise, (business) in the January 15, 1940 decree.[4] Dr. Oppenheimer, the government's expert on the German law testified that the administrators were not trustees or custodians, but were administrators appointed through the Reich Commissar in the interest of the German defense economy and to support the defense effort of Nazi Germany.

Dr. Steefel testified that the administrators were appointed to preserve title and to keep the enterprises running for the owner. With that I do not agree. Although legal title to the enemy controlled property was not disturbed, the German statute called for the appointment of administrators who were to keep the plants operating for the benefit of the German economy, as the government's expert, Dr. Oppenheimer testified. The property was not confiscated, nor the legal title taken, but the property was seized and taken over in the interests of Germany.

On February 27, 1940, the Minister of Economics of the Reich issued a circular

3. Title V of the basic decree of January 15, 1940 was entitled "Administration of Enterprises," and comprised eight separate sections designated Section 12 through 19 inclusively. The important sections are 12, 14(1), 15, 17 and 19 which provided:

"Section 12. *Conditions*.

"(1) An administrator may be appointed for the safe-guarding and preservation of the property of legal entities of the private law, associations of individuals, institutions, foundations and other trusts having their seat or head office or a branch in Germany, if the enterprise is directly or indirectly under decisive enemy influence.

"(2) The Reich Minister of Justice shall decide in doubtful cases whether an enterprise is under decisive enemy influence.

"(3) The cost of administration shall be borne by the enterprise."

"Section 14. *Powers of the Administrator*.

"(1) Unless the appointment of the administrator otherwise provides, he has power to do all court and out-of-court business and legal transactions in the course of the conduct of the enterprise. The powers of the manager and other persons with powers of representation or management are suspended during the administration; the same applies to the powers of all the organs."

"Section 15. *Duty of Diligence*.

"(1) The administrator shall apply to his activities the diligence of a careful administrator.

"(2) The administrator is subject to the supervision of the court."

"Section 17. *Termination of Administration*. The court may at any time terminate the administration and revoke the appointment of the administrator. * * * "

"Section 19. *Authorization*. More detailed regulations concerning the introduction, conduct and revocation of the administration shall be issued by the Reich Minister of Justice. He shall appoint a Reichs Kommissar for the uniform direction of the administration of enterprises."

4. In the period between September 3, 1939 and January 15, 1940, there was an intermediate decree on curatorship (dated October 11, 1939), which was repealed by the basic decree of January 15, 1940. During that intermediate period a curator or custodian could have been appointed for Wewag and W.Z.W., but none was. However, after October 11, 1939, Barton could not vote its shares in the three "Ag's" involved.

decree or regulation (Exh. IV) based in most part upon the Enemy Property Decree of January 15, 1940. It stated: "Independent enterprises which have their main office or a branch within the country and are directly or indirectly under enemy control are not enemies and their property is not enemy property. However, pursuant to [Section 12] of the Decree of January 15, 1940, upon application of the Reich Commissar for the handling of enemy property, an administrator can be appointed for said enterprises for the securing and conserving of the business by the competent Court of Appeals; these enterprises therefore are subject to supervision by the Reich Commissar."

On March 19, 1940, a newspaper announcement (Exh. V) appeared (presumably with government sanction) in one of the leading German newspapers, describing the purpose and policy of the decree of January 15, 1940, and circular decrees issued thereunder. The article stated that the basic decree of January 15, 1940 is designed "to change as little as possible the legal fate of the financial interests of the enemy incorporated in a company and to conserve these economic assets for the benefit of the German economy"; that the decree of January 15, 1940 set forth two broad measures to accomplish this purpose. It transferred to the Courts of Appeal the establishing of the administration and supervision over the Administrators and provided also for the appointment of a Commissar of the Reich for the handling of enemy property.

The article further stated that "amendments to articles and by-laws, sales, shutdown, require both the consent of the Reich Commissar and ratification by the Courts of Appeal"; that the Reich Commissar has the right to nominate the Administrator, "the supervision of whom in substantive regard is vested in him, while in formal regard, it is vested in the Court"; that the Reich Commissar determines the extent of the administration, i. e. whether as a "supervisory agency" or as "a full Administrator"; and that "a hearing of the head or owner of the business" on the issue of administration is not required.

Concerning the rights and powers of the shareholders, directors, and officers of the corporation placed under administration the Article stated:

"In the internal relationships of the company, provided that the appointment of the Administrator does not otherwise provide, the powers of the head of such company are suspended. Powers of attorney are suspended but not extinguished. The Administrator may rather confirm existing powers of attorney and of course, may issue new ones. In the case of corporations or cooperatives, neither the Board of Directors nor the Shareholders' Meeting will in principle remain in operation—unless otherwise stipulated in the appointment of the administrator."

There was no such stipulation in Zucker's appointment as Administrator for Wewag and W.Z.W.

On June 20, 1940, the Minister for Justice of the Reich issued a "circular decree", a Regulation, (Exh. VI) dealing with the commencement, conduct and termination of the administration of companies under enemy control pursuant to Section 12 of the decree on the Handling of Enemy Property of January 15, 1940.

The June 20, 1940 regulation provided that the Courts of Appeal appoint the Administrator upon application of the Commissar of the Reich for the Handling of Enemy Property, who is directly subordinate to the Minister of Justice of the Reich; that the Commissar when filing the application must propose to the Courts of Appeal a person suitable to conduct the administration, must define therein the scope of the powers of the Administrator, for the powers of the Administrator may be limited both with respect to specific persons and with respect to specific things; and finally must show

that there is concerned an enterprise which is under decisive enemy control.

The June 20, 1940 circular decree (regulation) then provided that the Court, before appointing the Administrator, must determine whether the application submitted is in proper form; whether the enterprise involved has its registered office, or branch office or property within the country; and whether the person proposed by the Commissar of the Reich for the office of Administrator is suitable for the position.

If the court finds that the person proposed to be unsuitable, it must request the Commissar of the Reich to propose a new person; however, it "is not up to the Court to determine whether the enterprise is under enemy control or whether the appointment of an Administrator is desirable". The Court is "bound by the determination of the Commissar of the Reich as to the extent and form of the administration". The Reich Commissar was the powerful appointing official. The court had very little to do except to formalize his request for an administration by court order.

Pursuant to the Regulation of June 20, 1940, upon the appointment of the Administrator, the powers of all the enterprise's "organs" or agencies, such as the officers, the Board of Directors, Board of Managers, Stockholders' meeting, and other persons authorized to represent or administer the enterprise, such as members, partners, holders of power of procuration, holders of powers of attorney, were suspended. The Administrator took over their functions. After his appointment the shareholders could not convene a meeting or take any steps to oust him. Unless otherwise stipulated in his appointment, he had the right, by virtue of his office, to grant new powers of procuration and powers of attorney, or to authorize a former holder, whose powers

have been suspended to continue to exercise his powers.[5]

The regulation further provided that preserving and securing the property entrusted to the Administrator was incumbent upon him; that in his activities, he must apply the care of a prudent Administrator; that he is responsible for all damage resulting from the failure to exercise the proper care; and that although the powers of the agencies or enterprises are suspended, the general provisions applicable to the form of enterprise in question as well as the provisions of Mercantile Law shall apply to enterprises placed under administration. "The Administrator, who combines in his office the powers of the agencies of the enterprise, must comply with such provisions in the administration of the enterprise entrusted to him." But the Administrator's authority was so fixed by the decree of January 15, 1940, and the subsequent circular decree or regulation of June 20, 1940, that he superseded the Officers, the Board of Directors and the stockholders of the corporation and took over their powers and functions in administering the affairs of the corporation. They ceased to have any say in the management of the corporate properties.

Supervision over the daily activity of the Administrator was vested in the Commissar of the Reich in charge thereof. The Administrator was subject to the Commissar's directions and instructions. The Administrator was obligated to report and account to the Commissar of the Reich for the Handling of Enemy Property at regular time intervals on the course of the administration, but was not obligated to report to the agencies of the enterprise, whose powers had been suspended pursuant to Section 14(1) of the basic decree of January 15, 1940.

5. With regard to the German corporation referred to as W.Z.W., Exhibit H discloses that prior to the appointment of Zucker as Administrator thereof on August 3, 1940, Messrs. Max Schafer, Albert Passler, and Reinhard Dohrmann possessed powers to sign and to represent the corporation. Zucker, upon his appointment, authorized the former holders, whose powers had been suspended, to continue to exercise their powers.

On July 20, 1940, Karl Zucker was appointed Administrator of Wewag pursuant to Section 12 of the basic decree of January 15, 1940, by order of the Court in Dusseldorf, (Exh. C) and as Administrator of W.Z.W. August 3, 1940 by order of the Court in Dresden (Exh. H). As Administrator, Zucker, was required to obtain the approval of the Reich Commissar "for all transactions involving the sale or shutdown of the company as such or of parts thereof, the purchase, sale or mortgaging of real property, as well as any other transactions exceeding the scope of regular business." With respect to measures "affecting the development or continuance of the company, such as alterations in its by-laws, its disposal or shutdown," the confirmation of the Court must also be obtained. Zucker was required to report to the Reich Commissar on the state of the company at regular intervals of three months.

Karl Zucker remained as Administrator of Wewag until June 2, 1945, when he was replaced by Messrs. Muller and Schwelm pursuant to order of the Allied Military Government, Property No. OA/320/13 (Exh. I). There is nothing to show when he was removed as Administrator of W.Z.W.

There is no proof as to where the shares of stock of Wewag and W.Z.W. were between September 3, 1939 and December 11, 1941. 65% of the total of outstanding shares of stock of I.V., a German holding company, were held for Barton, Ltd., by a bank in London. I.V. directly owned 90% of the capital stock of Wewag and 90% of the capital stock of W.Z.W. 28% of the shares of I.V. were owned by a German holding company known as Maschinen. It appears that the remaining 7% ownership of the shares of stock of I.V. was owned by outsiders, and was usually registered for voting purposes with the Dresner Bank. Wewag owned 50% of Maschinen and Barton, Ltd. owned the other 50%.

I.V. was a holding company for which no Administrator was appointed. Shareholder meetings of I.V. were held on January 5, 1940, and on January 24, 1941. No representative of Barton participated in those meetings. The I.V. shares represented at those meetings were owned by Maschinen, but were recorded in the names of two employees of Wewag (Maehler and Lenzen), apparently Germans. (Exh. II-A) It does not appear that any meetings of shareholders of Wewag or W.Z.W., the operating companies, were held after Britain declared war on Germany.[6]

6. On cross-examination Dr. Steefel testified that three of the German corporations involved, I.V., Wewag and W.Z.W. were "Ags"—similar to a joint stock company in the United States. As such they would have three main bodies or "organs"—the stockholders convened in meeting, the board of directors, and the board of officers.

The stockholders or shareholders' meeting would approve the distribution of profits and dividends; any change in the by-laws, or any increase in the capital, and any mergers or consolidations. The stockholders' meeting would elect the members of the board of directors, which aside from its general supervisory function, would approve the balance sheet prepared and submitted by the board of officers. The members of the board of officers were chosen by the board of directors.

The other German company involved, Maschinen, was a "G.M.B.H.", equivalent to a limited liability company. G.M.B.H.'s are usually privately held while an "Ag" is often a publicly subscribed corporation. The distinctive feature between the "Ags" and the "G.M.B.H.'s" is that the transferability of the stock in an "Ag" is much more facilitated than in the "G.M.B.H." Also the operation and management of "Ag" is in the public eye, subject to publicity in reporting and supervision, much more than is the case in the "G.M.B.H." The "Ag" has to report each year its balance sheet in the public press or official organ, while the "G.M.B.H." can carry on in private. As a rule the "G.M.B.H." does not issue stock certificates. The interest of the owners of a "G.M.B.H." can be described as a participation. Certificates evidencing

It would seem that if the I.V. shares owned by Barton, Ltd. were considered of sufficient importance to have them held in custody for Barton, Ltd., in a London bank, the same care would be exercised over the stock of the German operating companies, Wewag and W.Z.W. Sonnenberg was able to communicate with Lindars and Elder in England at all times during the period September 3, 1939 to December 11, 1941. In 1945, after the war with Germany had ended, Sonnenberg went abroad. He could have learned then where the Wewag and W.Z.W. stock had been between September 1939 and December 11, 1941, if he did not already know. Dr. Wirtz says nothing about it in his deposition. As the record stands there is no proof whatsoever on that question.

Dr. Steefel, referring to the commentary of Krieger, stated that the power of the owner of the property to dispose of title to his property, in this case stock, by last will or testament remained unaffected. The title was not confiscated under the German statute of January 15, 1940. It does not appear that any stock certificates were ever seized. But Dr. Steefel does not, in his testimony, distinguish between title and ownership, or have in mind that a person may still have title and yet be dispossessed of ownership as Judge L. Hand points out in Rozenfeld v. Commissioner of Internal Revenue, 2 Cir., 181 F.2d 388, 389.

The German regulation of January 1, 1941 (Exh. VII) provided that if an administration had been established over a corporation, and during such administration members of the Board of Directors, whose powers had been suspended under the statute and regulations were required in accordance with the articles and by-laws to withdraw from the enterprise agency, "the Administrator, if acts on the part of specific agencies of the company are necessary for the withdrawal of the members of the Board of Directors, is authorized to effect such acts."

Dr. Oppenheimer testified that the appointment of an Administrator went beyond merely blocking ownership of the stock of the German company—and also went beyond a mere supervising of the conduct of the business. "The Administrator was supposed to run the business. He conducted the business. And he was everything in one. He was the manager and he was the board of directors and he was the shareholder. And he could do, partly with the approval of the Reich Commissar and the confirmation of the Court of Appeal, he could do anything he liked. He could increase the capital, he could dissolve the company." With the approval of the Reich Commissar and the confirmation of the Court of Appeal, the Administrator could sell all the assets of the company under administration; could change the by-laws and could consent to mergers and consolidations, without consulting the shareholders. The Administrator was the sole manager and "organ" of the companies. He was not responsible to the enemy owner for what he did pursuant to the powers conferred on him by the German statutes and decrees and court orders. It was so held by the German Court of Appeals of Koblenz (June 17, 1952) in a restitution case.

Dr. Oppenheimer stated that after September 1939 Barton could not receive dividends or any share of the profits. Prior to 1939 there was no law against enemies. There was merely a foreign exchange regulation which prohibited the *transfer* of money abroad in the interest of maintaining the economy and because of the scarcity of foreign exchange. It did not *prohibit payment* of dividends to enemy owners located in Germany. It was only in 1940 that legislation was enacted prohibiting or preventing any dividend payments to enemy owners. The

---

participation are not necessary and are only issued if the by-laws so provide. Ownership of a participation is usually evidenced by an entry in the books of the corporation.

The "G.M.B.H." is usually run by one or more managers comparable to the board of officers of an "Ag". The managers are appointed by the meeting of the owners of the participations.

question of transfer became moot under this legislation.

In concluding his direct examination, Dr. Oppenheimer stated that the rights of Barton in the four German companies "were actually lost on the declaration of war with Germany, by England with Germany. But in law, by statute, they were lost after the effective date of the decree of January 15, 1940."

On June 14, 1951, the Bonn Government issued a statute "Repealing Wartime Measures," (Exh. IX). The statute was published in the official Law Gazette of the Federal Republic of Germany on June 16, 1951, and took effect immediately "upon its promulgation". It repealed as of May 8, 1945, "all provisions, which as a result of the state of war, treat the warring states and their nationals as enemies"; however, the repeal "does not affect the legality of measures which were taken after May 8, 1945 for the preservation of former enemy property or otherwise for its proper administration".

Dr. Steefel testified that the effect of this law of June 14, 1951, was not to repeal the basic statute of January 15, 1940, because for all practical purposes through the Allied occupation no German administration of what was formerly enemy property could have effectively exercised any of the powers with which it was invested under the German statute until Germany's surrender. Apparently for technical reasons the statute of 1951 had to be passed, but it had no effect on what had been done under the statute of January 15, 1940, down to May 8, 1945.

The plaintiff cites two decisions of German courts in relation to enemy property seized during the war. See Exhs. X and XI. Both cases were for the restitution of property and involved the issue whether the acts of Administrators and Curator Absentis appointed pursuant to the basic decree of January 15, 1940, and alien property war laws and regulations, in disposing of certain property constituted "discriminatory acts", upon which a recovery could be had. The German court held that they did not.

Those cases have no bearing on the basic issue of the case at bar. While it may be true that the taking over of the properties of Wewag and W.Z.W. was not made under the so-called "discriminatory" laws, but was done pursuant to the decree of January 15, 1940, and supplementary decrees or regulations which concerned the handling generally of enemy property or enemy controlled property located in Germany, under which the German officials and Administrators acted, the important issue here is not whether there was a confiscation or the owners retained legal title; but the extent to which the taking over dispossessed them of ownership, that is the issue. Whether we consider what was owned as the shares of stock of Wewag and W.Z.W., or the physical assets of those operating Companies, Barton, Ltd., and plaintiff were completely dispossessed of ownership and had been thus dispossessed for many months prior to December 11, 1941, and the remoteness of any recovery of the property or its proceeds was evident.

The basic legal principles involved and the proper test to be applied in determining if a war loss occurred under Section 127 of the Internal Revenue Code of 1939 were stated by Judge Learned Hand in the case of Rozenfeld v. Commissioner of Internal Revenue, 2 Cir., 181 F.2d 388 at page 390, supra:

"Nor can we agree to the distinction suggested by the taxpayer; that the seizure in that case [United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120] was lawful, being made under German law—the property being situated in that country—while in the case at bar the factory was seized without warrant of any law. [It was a factory in Poland seized when the German military force overran Poland in September and October 1939.] The relevant consideration, as we understand the Supreme Court, is not the legal consequences of the seizure, but how

completely the owner is dispossessed: i. e., the remoteness of any recovery of the property or its proceeds. After all, that is a sensible test of whether he has suffered a loss, which should be deducted."

Section 127(a) (3) of Title 26, 1939 Code, provides in part:

"For the purposes of this paragraph, an interest shall be deemed to have become worthless notwithstanding the fact that such interest has a value if such value is attributable solely to the possibility of recovery of the property, compensation (other than insurance or similar indemnity) on account of its destruction or seizure, or both."

It was Dr. Oppenheimer's opinion, with which the Court agrees, that the effect of the basic decree of January 15, 1940, was to put enemy property in Germany under the administrative control of the German officials, and that the British owner of the stock in those German corporations lost the right to exercise ownership over the property, apart from the vesting of any title. Apparently he recognized the distinction between title to and ownership of property; and that as Judge L. Hand pointed out in the Rozenfeld case, supra, an enemy of Germany might have title to property located in Germany and yet be dispossessed of ownership of the property, by reason of the action of the German government.

▇ Although Section 127(a) (2) and (3) of the 1939 Internal Revenue Code established a conclusive presumption that the taxpayer's property in Germany or in territory controlled by Germany, was physically destroyed or seized on December 11, 1941, Ezra Shahmoon v. C.I.R., 13 T.C. 705, affirmed 2 Cir., 185 F.2d 384; Abraham Alber Andriesse v. C.I.R., 12 T.C. 907; Ervin Kenmore v. C.I.R., 18 T.C. 754, affirmed 2 Cir., 205 F.2d 90; and Dezdo Goldner v. C.I.R., 27 T.C. 455;

nevertheless, the burden was on the taxpayer to prove that on December 11, 1941, he had something to lose, that the property was actually in existence in Germany or in territory controlled by Germany on that date, and that it had not been physically destroyed or seized prior to that date. Ernest Adler v. C.I.R., 8 T.C. 726; Eric H. Heckett v. C.I.R., 8 T.C. 841. The test is a practical one and does not depend upon the absolute forfeiture of all legal right. Rozenfeld v. Commissioner of Internal Revenue, 2 Cir., 181 F.2d 388, supra.

▇ If the taxpayer suffered his loss prior to December 11, 1941, the loss is not deductible as a war loss for the year 1941, under Section 127. The taxpayer has not sustained his burden of proof in the case at bar. I have concluded that the war loss plaintiff suffered was actually sustained prior to December 11, 1941, and therefore he had nothing more to lose on that date. Hence he had no deductible war loss under Section 127(a) (2) or (3).

## Conclusions of Law

(a) This Court has jurisdiction of the subject matter of this action under Sections 1340 and 1346 of Title 28 U.S.Code (62 Stat. 932 and 933) and jurisdiction over the parties thereto.

(b) The plaintiff, Henry H. Sonnenberg, did not sustain a war loss on December 11, 1941 under Section 127(a) (2) or (3) of the Internal Revenue Code of 1939, deductible as such in calculating his taxable income for the year 1941.

(c) The plaintiff is not entitled to a refund of any part of the income tax of $44,369.01 for the tax year 1941, which he paid the Collector of Internal Revenue on March 14, 1942.

(d) The complaint herein should be dismissed on the merits, with costs to the defendant.

(e) Let judgment be entered accordingly.